LAWRENCE A. APPLEY AND ESTATE OF RUTH W. APPLEY, DECEASED, LAWRENCE A. APPLEY, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Appley v. Commissioner
Docket No. 2242-77.
United States Tax Court
T.C. Memo 1979-433; 1979 Tax Ct. Memo LEXIS 94; 39 T.C.M. (CCH) 386; T.C.M. (RIA) 79433; October 23, 1979, Filed Sterling L. Weaver, for the petitioners. David R. Smith, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency
1972
$ 35,258
1973
25,690
1974
34,812
The only issue for decision is whether a Morgan horse farm operated by petitioners as a small business corporation constituted a trade or business or was an "activity not engaged in for profit" within the meaning of section 183 of the Internal Revenue Code of 1954, [1] for each of the years 1972 through 1974. *97 FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, and the exhibits attached thereto, are incorporated herein by this reference. Lawrence A. Appley (hereinafter petitioner) and the late Ruth W. Appley were husband and wife who resided in Hamilton, New York at the time they filed their petition. Petitioner and his wife filed joint income tax returns for the taxable years 1972, 1973 and 1974. Ruth W. Appley died on March 10, 1977. Petitioner qualified as executor of her estate on March 30, 1977 and, in that capacity, was substituted as a party. In 1930, petitioner began a career in business as personnel manager of the Buffalo Division of Mobile Oil Corporation. He later became education director of Mobil's domestic and foreign operations, a vice-president and director of Vick Chemical Co., and a vice-president and director of Montgomery Ward & Co.
During World War II, petitioner served first as assistant to the Secretary of War and later as executive director and deputy chairman of the War Manpower Commission. Petitioner has been recognized as one of the country's foremost experts in the field of management and organization. *98 He has written the following books on management: Management in Action; Values in Management; The Management Evolution; A Manager's Heritage; and Formula for Success: A Core Concept of Management. Petitioner's activities have been the subject of articles in such publications as Business Week and Finance, and he has been consulted by several presidents of the United States on national and international economic issues. Petitioner joined the American Management Association (hereinafter AMA) as its president in 1948, and served in that capacity until his retirement in 1968, when he was elected chairman of the board of directors serving there until 1974. The AMA is a not-for-profit educational organization which provides management training to leaders of business and industry. In 1948, when petitioner started work as its president, the AMA had fewer than 6,000 members and an annual income of only $34,000. By 1968, when petitioner retired, the AMA's membership had expanded to 64,000 and its annual income had grown to over $27,000,000. In 1964, petitioner began to make financial plans for his retirement from the presidency of the AMA which would have been mandatory in 1969. He *99 began to look for some new source of income to replace the salary he had been receiving from the AMA. Petitioner first investigated the feasibility of raising chickens in an automated operation. He started such a venture with the AMA and at one point had about 500 chickens. Dissatisfied with the results, he then studied the plausibility of raising Angus cattle but dismissed this when his investigation indicated the apparent unlikelihood of profitable operations. Shortly thereafter, petitioner began to consider the possibilities of breeding and raising Morgan horses. He consulted with the author of several books on Morgan horses. He believed that as a growing number of people were leaving the city for the country there would be an expanding market. Moreover, the Morgan breed of horses had not been promoted well because of disagreements among the members of the American Morgan Horse Club. With the purchase of five Morgan horses in 1964, petitioner began a Morgan horse farm in Hamilton, New York, known as Saddleback Farm. In 1965, he incorporated his proprietorship as Saddleback Farm Inc., a New York corporation in which petitioner and his wife owned all the stock. At the *100 time petitioner commenced operations at Saddleback Farm, he had no first-hand knowledge or experience in breeding or raising horses in general, or Morgan horses in particular. In 1965, petitioner hired an experienced trainer, and an experienced farm manager, to train and breed horses at Saddleback Farm. In 1967, petitioner fired both individuals because he decided they were incompetent. In 1968, petitioner hired another trainer. Petitioner fired this person in 1970, for beating a horse and not working at a satisfactory level. Petitioner considered closing the farm in 1970 because the results up to that time had been disappointing and future success seemed unlikely in the absence of a competent trainer. In late 1970 he heard that the farm might be able to employ Frederick R. Herrick (hereinafter Herrick) as its manager, trainer and breeder. Petitioner immediately attempted to recruit Herrick because of his reputation as the outstanding trainer and breeder in the Morgan horse world. Herrick had been the manager, trainer and breeder at Voorhis Farm in Red Hook, New York, for Sixteen years and had developed there the Applevale strain, one of the leading and most popular bloodlines *101 of Morgan horses. Herrick had offers from three other farms to train Morgans when he chose to take control of the breeding and training programs at the Saddleback Farm. Herrick chose to train there because of petitioner's stated intention of producing top horses and operating the farm as a longterm proposition.
After Herrick was hired, in February 1971, the farm expanded its facilities, the size of its herd, and its advertising efforts. This expansion was pursuant to a plan worked out by petitioner and Herrick to improve the bloodlines of the Saddleback herd. This plan called for the expansion of the herd over several years as its bloodlines were developed, a reduction of the herd to cull out less desirable horses and a subsequent expansion of the number of brood mares of the desired strain. At or near the time when Herrick came to Saddleback Farm, the farm purchased two stallions and four mares of the Applevale strain. Herrick used these horses in the breeding program at Saddleback Farm. Also in 1971, Herrick's wife, Jeanne Mellin Herrick, came to Saddleback Farm with him. Mrs. Herrick is a well-known Morgan horse artist and sculptress, and has authored two books about Morgan *102 horses, titled The Morgan Horse and The Morgan Horse Handbook. When the Herricks arrived in 1971, Saddleback Farm embarked on a general plan of expansion. At the end of 1974, the farm had extensive facilities for the breeding, boarding, and training of Morgan horses. Six buildings were used, not including a silo and a small pump house. These buildings were: (i) Main stable or barn. This was constructed in 1957. As of March, 1979, the lower level contained fourteen permanent stalls plus three temporary stalls, the Saddlery Shop, the groom's apartment, the tack room and office. As of March, 1979, the upper level contained five stalls plus storage areas for hay, grain and shavings. (ii) A "maternity ward". This was constructed in 1966 and contained four foaling stalls with an adjoining harness and observation room as of March, 1979. (iii) A carriage shed. As of March, 1979, this contained two permanent stalls and room for six carriages and cutters. It was constructed during the latter half of 1974. (iv) An exercise barn and an attached exercise shed. The barn was constructed in 1971. The exercise barn is a 60 feet x 60 feet sand floor barn used for exercising horses. *103 The attached shed contains an electric exerciser that takes four horses at one time. (v) A vehicle shed. This was constructed in 1967. During the years 1970-75, the vehicle shed was occupied by vans, trailers, tractors and trucks. Four stalls were added to the vehicle shed in the summer of 1978. (vi) Old Orchard Cottage. The trainer and his wife live in this cottage. It was constructed in 1962. An indoor riding arena, measuring 60 feet 144 feet, was constructed at the farm in 1976 by petitioner. The farm also uses a quarter-mile track and 30 acres of pasture. Prior to November 23, 1974, the AMA owned all the buildings set forth in the preceding paragraphs, except for the carriage shed and the exercise barn. Saddleback Farm Inc. paid rent to the AMA for the lease of these buildings. On November 23, 1974, petitioner and his wife purchased the buildings and land which had been owned by AMA. After that date, petitioner rented these buildings and land to Saddleback Farm Inc. On November 23, 1974, petitioner and his wife also purchased the farmhouse and the surrounding 3.17 acres of land at Saddleback Farm from AMA. Prior to 1973, petitioner and his wife had never lived *104 at the farm. In 1973, petitioner rented the farmhouse from the AMA for a residence when his wife became ill. At all times material herein, Saddleback Farm's operations included a breeding program and a boarding program for outside mares. From 1965 to the present time Saddleback Farm has maintained a registry for all horses bred or foaled at the farm. This record is filed with the American Morgan Horse Association (hereinafter AMHA). All foals produced pursuant to the farm's breeding program are named with the "Saddleback" prefix. The "Saddleback" prefix is protected by the AMHA Registry and no other breeder may use that name. It takes from eight to twelve years for a breeding program of the type conducted by Saddleback Farm to establish quality bloodlines that are reproducible. Horses in a breeding program must be bred at least three generations to establish the herd's bloodlines. From 1965 to the present, the farm has employed full and part-time employees to perform various services, has withheld income and social security taxes from wages paid to those employees, and has filed the required employment tax returns. As of March 1979, the farm has five full-time employees *105 during the summer and three full-time employees during the winter. The total size of the herd at Saddleback Farm at the end of each of the years 1971 through 1977 was approximately as follows: Date
Size of Herd
December 31, 1971
20 horses
December 31, 1972
25 horses
December 31, 1973
39 horses
December 31, 1974
46 Horses
December 31, 1975
45 horses
December 31, 1976
25 horses
December 31, 1977
25 horses
During the years at issue formal breeding contracts were used by Saddleback Farm, and registration papers were given to each purchaser of horses. The following table shows the total stud fees received by the farm in the indicated years. Year
Stud Fees
1971
$ 2,865
1972
2,800
1973
3,014
1974
4,761
1975
5,758
1976
2,645
1977
10,290
The following table shows the number of outside mares that were bred at Saddleback Farm in the indicated years: Year
Mares Bred at Farm
1971
12
1972
12
1973
8
1974
19
1975
33
1976
22
1977
23
1978
26
Complete breeding and medical records are kept for every mare at Saddleback Farm. From 1965 to the present time, petitioner has retained certified public *106 accountants to set up bookkeeping and accounting systems and to maintain the necessary books and records for Saddleback Farm, Inc. To maintain the records at Saddleback farm itself and to have information on a daily basis, a part-time accountant was hired in August 1974. There has never been any intermingling of the petitioner's personal records and the records of the Saddleback Farm Inc. It maintains a complete record of all farm machinery and equipment. From the time that the farm was incorporated, certified public accountants have produced monthly operating statements for the farm. Petitioner had reviewed the monthly operating statements each month before Herrick's arrival. After Herrick's arrival, they both reviewed the monthly operating statements each month to determine how to cut costs and increase income. For example, the farm has minimized its costs of energy by requesting representatives of the electric company to visit the farm and give advice on how to conserve energy. The farm has experimented with different types of bedding for the stalls. It began with straw, then tried sawdust, and finally started using wood shavings, all in an effort to save money. The farm *107 raises its own hay, harvested by its own employees, in an effort to keep costs down. In order to save veterinary fees some of the farm employees have been trained to give injections to horses. In 1972, Saddleback Farm started the Saddlery tack shop to sell horse supplies at retail. The shop is located in the main stable in a room devoted exclusively to it. All sales are recorded on three-part invoices. The Saddlery enables the farm to purchase supplies for its own use at wholesale prices and to sell items at retail for a profit. Since the Saddleback Farm was founded, it has advertised in virtually every issue of The Morgan Horse Magazine. It has placed advertisements in show programs, local weekly newspapers, county fair programs, and Horsemen's Yankee Peddler. It has been open to the public since it was established. It has promoted itself by holding sales of horses at the farm, advertised by printed circulars. The New York State Morgan Horse Society has been allowed to hold driving, harness, and training clinics there in order to publicize the Saddleback Farm. Since 1966, Saddleback Farm has entered its horses in show ring competition at various horse shows around the *108 country. There is a high correlation between success in horse shows and success in the marketplace. Saddleback Farm has sold horses to buyers in Arizona, California, Delaware, Georgia, Maryland, Michigan, New Hampshire, New Jersey, New York, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Vermont, Wisconsin, Australia and England. The farm's breeding program was undertaken to produce a horse that will be successful in the show ring and in the marketplace. A major sale of horses in 1976 was undertaken to cull horses that did not fit into the breeding program, to generate income from horse sales, and to publicize the name of Saddleback. Selling a large number of horses in 1976 did not reduce the quality of the herd. In 1970, the farm's breeding program produced Saddleback Supreme, a dark chestnut stallion. Supreme was Park Saddle Champion at the 1975 New England Morgan Horse Show, and was first booked for breeding at the farm during the 1975 season. In 1977, he hurt his ankle. As a result, he missed about half of the 1977 show season. In May 1972, the farm's breeding program produced Saddleback Sealect, a bay stallion sired by Applevale Challenger, a stallion which *109 Herrick had brought with him from the Voorhis Farm. Saddleback Sealect was first bred in 1975 as a 3-year old. He attracted outside mares for breeding because of his bloodlines and conformation and was booked at stud for breeding seasons from 1975 through 1978. Herrick owned a one-half interest in Sealect, and then purchased the remaining one-half interest from petitioner on December 20, 1976 for $15,000. In November 1978, Herrick sold Sealect for $25,000 and five free breedings, which are worth approximately $2,500. The total stud fees earned by Saddleback Supreme and Saddleback Sealect in the farm's breeding program for each of the years 1975 through 1978 were: Saddleback
Saddleback
Year
Supreme
Sealect
1975
$2,250
$2,000
1976
750
2,800
1977
750
3,400
1978
2,250
1,500
Saddleback Su-prano, an offspring of Saddleback Supreme, was sold by the farm for $10,000 in 1977. The Kohler Morgan Horse Farm refused an offer in 1978 or 1979 to purchase Su-prano for $25,000. During the years 1965 through 1977 Saddleback Farm sold a number of horses. The number sold in each year, the selling prices, adjusted basis, and total gain or (loss) on sales *110 of horses in each year were as follows: Number of
Selling
Adjusted
Gain or (Loss)
Year
Horses Sold
Prices
Basis
On Sales
1965
3
$ 1,394
$ 2,434 $ (1,040)
1966
1
2,500
404
2,096
1967
4
8,720
3,309
5,411
1968
0
0
0
0
1969
2
1,800
0
1,800
1970
7
12,050
4, 894
7,156
1971
15
24,024
6,690
17,334
1972
6
12,243
1,000
11,243
1973
7
23,105
1,461
21,644
1974
6
18,500
3,809
14,691
1975
12
32,717
8,542
24,175
1976
33
83,575
20,670
62,905
1977
8
51,825
6,886
44,939
In late 1976, Saddleback Farm began to offer Herrick's training services to outsiders. The outside training program was curtailed considerably in 1978 because it trained horses that competed with the Saddleback horses in the show ring, it reduced the time available for training the farm's own horses, and it was not possible to train horses profitably due to the costs of the necessary additional help. This curtailment was effected by increasing the monthly training fee from $250 to $350.
During the years 1972 through 1977 Saddleback Farm Inc.'s gross receipts were earned from the following sources: 1972
1973
1974
Saddlery
$ 6,051
$13,606
$11,352
Boarding
3,803
4,021
6,853
Training
720
160
0
Show Prizes
972
3,730
4,120
Breeding
2,800
3,014
4,761
Gross Rents
193
1,650
0
Other
384
1,247
0
SUBTOTAL
14,923
27,428
27,086
Receipts from Sales
of Horses
12,243
23,105
18,500
TOTAL
27,166
50,533
45,586
*111 1975
1976
1977
Saddlery
$13,743
$12,878
10,917
Boarding
12,809
12,657
28,966
Training
202
666
11,297
Show Prizes
2,462
2,387
1,520
Breeding
5,758
2,645
10,290
Gross Rents
0
0
0
Other
0
0
0
SUBTOTAL
34,974
31,233
62,990
Receipts from Sales
of Horses
32,717
83,575
51,825
TOTAL
67,691
114,808
114,815
The financial history of Saddleback Farm Inc. for the years 1965 through 1977 is as follows: SADDLEBACK FARM INC. (1)
(2)
(3)
(4)
(5)
Gross Receipts
Total
Gross
Other
Total of
from Sales of
Gross Receipts
Year
Receipts a
Income
(1) & (2)
Horses
(3) & (4)
1965
3,303
0
3,303
1,394
4,697
1966
9,961
0
9,961
2,500
12,461
1967
8,859
700 b
9,559
8,720
18,279
1968
5,957
0
5,957
0
5,957
1969
3,270
75
3,345
1,800
5,145
1970
2,757
157
2,914
12,050
14,964
1971
6,596
1,250
7,846
24,024
31,870
1972
13,758
1,165 c
14,923
12,243
27,166
1973
22,048
5,380 d
27,428
23,105
50,533
1974
27,086
0
27,086
18,500
45,586
1975
34,974
0
34,974
32,717
67,691
1976
31,233
0
31,233
83,575
114,808
1977
62,990
0
62,990
51,825
114,815
*112 (6)
(7)
(8)
(9)
(10)
(11)
Gross
Total
Taxable
Cost of
Profit
Gains &
Income
Income
Goods Sold
(1)-(6)
Losses
(2)+(7)+(8)
Deductions
(9)-(10)
1965
6,640
(3,337)
(1,079 )
(4,416)
14,948
(19,364)
1966
7,054
2,907
2,096
5,003
21,891
(16,888)
1967
7,452
1,407
6,139
8,246
21,805 (13,559)
1968
8,435
(2,478)
0
(2,478)
29,729
(32,207)
1969
8,741
(5,471)
1,306
(4,090)
29,937
(34,027)
197 0
10,079
(7,322)
7,156
(9)
30,031
(30,040)
1971
16,841
(10,245)
17,334
8,339
62,801
(54,462)
1972
22,690
( 8,932)
5,764
(2,003)
60,783
(62,786)
1973
33,240
(11,192)
21,644
15,832
62,529
(46,697)
1974
32,426
(5,340) 14,691
9,351
75,539
(66,188)
1975
32,384
2,590
22,469
25,059
81,196
(56,137)
1976
34,301
(3,068)
63,905
60,837
81,703
(20,866)
1977
32,395
30,595
46,059
76,654
75,253
1,401
In 1978, Saddleback had a profit of $4,777. Petitioner joined the American Morgan *113 Horse Association in 1964 and in 1970 was elected its president. He remained in that position until 1973 when he was elected chairman of the board. In 1974 he was elected again to a one year term as president. Petitioner viewed his work as president of the AMHA as a method by which he could create a profitable market for his farm's product. He undertook to enlarge the market for Morgan horses by increasing the membership of the AMHA, insuring the integrity of the American Morgan Horse Registry, improving the Morgan Horse Magazine, getting agreement within the AMHA on its proper role and on Morgan judging standards, and by promoting the Morgan horse through the AMHA.For example, in 1971, the AMHA had 2,444 members, but by 1975 it had 5,740 members. In 1970 the AMHA had six employees but by 1975 it had eighteen employees. While the total income of the AMHA for the calendar year 1969 was $87,200, the total income for its fiscal year 1974 was $505,060. In 1972, upon petitioner's recommendation, the AMHA adopted a "Program for Positive Action" that set forth the activities to be undertaken by the AMHA to improve and promote the breed and to strengthen the AMHA itself. In addition, *114 during his tenure as president, the AMHA established the Grand National Show for Morgans and, after finally resolving its internal differences, adopted a uniform system of judging standards. Petitioner developed extensive knowledge concerning the Morgan horse area, the activities of the AMHA, and the history and operation of the farm. During the years 1972 through 1974, petitioner devoted approximately 25 to 30 percent of his time to activities directly connected with Saddleback Farm and another 25 percent of his time to the activities of the AMHA. Petitioner does not ride horses because of a serious back operation about 20 years ago, but he does drive them.In 1975 he won an award for Reserve Grand Champion Amateur Driver at the Grand National Morgan Horse Show. Mrs. Appley never rode a horse during her life. Petitioner's children and grandchildren all live on the West Coast of the United State.Accordingly, they ride horses at the farm only infrequently. Since petitioner has operated the farm, he has driven horses occasionally. He drove horses in horse shows because he felt that he should do so as president of the AMHA. He goes to horse shows in order to congratulate the *115 farm's riders and drivers when they win events and because it is satisfying for him to see the Saddleback horses win. For the first four years of operations at Saddleback Farm (1964-1968), petitioner was still the president of the American Management Association. Upon his retirement in 1968, petitioner became chairman of the board of directors of the AMA. Until 1970, petitioner did not spend a great deal of time on the day to day operations of Saddleback. Although the farm properties were originally owned by the AMA, they contained no swimming pools, tennis courts, or hunting lodges. The farm has not been used to entertain people involved in Morgan horse activities. At no time from 1970 to the trial date were meetings of the Board of Directors of the AMA or AMA seminars held on the property used by Saddleback Farm or at the farm house. Petitioner has gone to only one party for horse show exhibitors since the farm was founded. During 1972, petitioner was a director of twelve corporations and earned $109,701 as director's and consultant's fees. During 1973, he was a director of the same twelve corporations and earned $110,314 as director's, trustee's or consultant's fees. *116 In 1974, he was a director of eleven corporations and earned $119,796 as director's, trustee's or consultant's fees. At the time of trial petitioner was a member of the board of directors of eight corporations. At all times material herein Saddleback Farm Inc. has elected to be taxed as a small business corporation under Subchapter S of the Internal Revenue Code of 1954, as amended. Petitioner and his late wife claimed the following losses from the operation of the farm on Schedule E of their joint income tax returns for the years 1972, 1973 and 1974, as losses from a small business corporation: Year
Losses from Farm
1972
$62,786
1973
46,697
1974
66,188
During the years 1964 through 1977 petitioner and his late wife reported gross income on their income tax returns from the following sources and in the following amounts: From
Year
AMA
Fees
Dividends
Interest
1964
89,423
35,093
4,928
0
1965
95, 000
39,815
6,072
0
1966
95,000
54,247
6,681
495
1967
95,000
53,295
6,495
311
1968
95,000
54,393
7,545
146 1969
73,109
73,246
8,496
437
1970
50,000
90,927
9,245
423
1971
50,000
97,005
10,919
773
1972
45,833
109,7 01
10,391
726
1973
25,000
110,314
12,848
705
1974
12,500
119,796
12,399
427
1975
0
99,144
10,571
952
1976
0
104,225
11,437
1,918
1977
0
118,537
14,620
1,409
*117 Capital
Year
Annity [1]
Gain [2]
Total [3]
Total [4]
1964
(315)
$129,129
$120,314
1965
140,887
120,744
1966
156,423
138,558
1967
46
155, 147
141,565
1968
129
157,213
125,141
1969
17,454
114
172,856
122,479
1970
25,916
51
176,562
122,128
1971 25,916
139
184,752
105,852
1972
25,916
136
192,703
129,067
1973
25,916
(1,146)
173,637
126,934
1974
25,916 14,184
185,222
110,992
1975
25,337
4,651
140,655
80,530
1976
25,337
17,344
160,261
126,347
1977
25,337
(9,360)
150,543
158,908
ULTIMATE FINDINGS OF FACT Petitioner had a bona fide intention and good faith expectation of earning a profit from his Morgan horse breeding and raising operations for each of the years 1972 through 1974. OPINION The question presented in this case is whether a Morgan horse farm operated by petitioner as a small business *118 corporation constituted a trade or business or was an activity not engaged in for profit within the meaning of section 183(a). Section 183(a) provides that if an activity is engaged in by an individual or an electing small business corporation (as defined in section 1371(b)) and if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed except as provided for by section 183(b). Section 183(b) limits the total permissible deductions. Section 183(b)(1) allows deductions which would be allowable without regard to whether or not such activity is engaged in for profit. Section 183(b)(2), however, allows a deduction equal to the amount of the deductions which would be allowable only if such an activity were engaged in for profit, but only to the extent that the gross income derived from such activity exceeds the deductions previously allowed under section 183(b)(1). See also Section 1.183-1(b)(1), Income Tax Regs.
Section 183(c) *119 defines an "activity not engaged in for profit" as an activity otherthan one with respect to which deductions are allowable under section 162 or section 212(1) and (2). Section 183(d) provides that in the case of an activity which consists in major part of the breeding, showing or racing of horses, if the gross income derived from an activity for two or more of the taxable years in a period of seven consecutive taxable years exceeds the deductions attributable to the activity, then the activity is presumed to be an activity engaged in for profit, unless the Commissioner establishes to the contrary. Because Saddleback Farm Inc. has continually operated at a loss from 1965 to 1976, such presumption is not applicable in this case.
In the case of an individual or small business corporation, the standard for determining (1) whether there is a trade or business carried on so that the expenses are deductible under section 162, (2) whether the expenses were paid or incurred for the production or collection of income so that they would be deductible under section 212(1), and (3) whether *120 the expenses were paid or incurred for the management, conservation, or maintenance of property held for the production of income so that they would be deductible under section 212(2) is the same: did the individual or small business corporation engage in the activity with the predominant purpose and intention of making a profit? Allen v. Commissioner,72 T.C. 28, 33 (1979); Golanty v. Commissioner, 72 T.C.     (June 5, 1979), on appeal (9th Cir. Aug. 31, 1979); Engdahl v. Commissioner, 72 T.C.     (July 11, 1979); Dunn v. Commissioner,70 T.C. 715, 720 (1978). Petitioner's expectation of profit need not be reasonable but he must establish that he entered into the activity or continued the activity with a bona fide intention and good faith expectation of making a profit. Section 1.183-2(a), Income Tax Regs.Allen v. Commissioner, supra at 33. The question of petitioner's intent is a factual one on which he bears the burden of proof.
Section 1.183-2(b), Income Tax Regs. *121 , lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. No one factor is determinative. Nor is the determination based on whether the number of listed factors indicating a lack of profit exceeds the number indicating a profit objective or vice versa. The determination is to be based on all the facts and circumstances of the case. Engdahl v. Commissioner,supra.
The suggested relevant factors are (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisor; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity will appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity, (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Se have found as an ultimate fact that on the basis of all the facts and circumstances in this case petitioner operated Saddleback *122 Farm Inc. with the objective of making a profit. Our reasons are set forth below. Petitioner carried on his horse breeding and raising activities in a businesslike manner and maintained a complete set of books and records. From 1965 to the date of trial, Saddleback Farm has retained certified public accountants to set up bookkeeping and accounting systems. There has never been any intermingling of petitioner's personal records with those of the farm. Petitioner reviewed the operating statements every month. Saddleback Farm has withheld income taxes and social security taxes from the wages paid to its employees and has filed the required employment tax returns. The tack shop enables the farm to purchase its own supplies at wholesale and sell itwms at retail or a profit. All sales made through the tack shop were recorded on three-part invoices. From its beginning the farm maintained a registry for all horses bred or foaled and during the years at issue. Formal breeding contracts were used. Complete breeding and medical records were kept for every mare. The farm has tried to minimize its energy costs, and has experimented with different and cheaper types of bedding for the *123 stalls. In an effort to keep costs down the farm raises and harvests its own hay and trains its employees in basic veterinary medicine to given injections to horses. Saddleback Farm has done extensive advertising and promotion. It has always been open to the public. The scale of facilities for the breeding, boarding and training of horses is incompatible with the normal concept of a hobby. The size of the herd from 1971 to 1977 has ranged from approximately 20 to 46 horses. The farm has sold horses to buyers from sixteen states and two foreign countries.
When petitioner began Saddleback Farm he did not know the Morgan horse business, so he hired experienced, and he thought competent, trainers. In 1971, he hired Herrick, a highly reputed breeder and trainer, who had previously developed a popular and valued strain of Morgan horses. Petitioner worked conscientiously with Herrick supervising the breeding and training program. He employed his notable business background to manage the farm's operations in a businesslike and commercial manner. Petitioner joined the American Morgan Horse Association in 1964 and was elected its president in 1970. He served either as president or *124 chairman of the board from 1970 to 1975. During his tenure the AMHA more than doubled its membership, tripled its employees, more than quadrupled its income, established the Grand National Show and finally agreed upon a uniform system of judging standards. We are persuaded that petitioner's considerable organizational skills in this area substantially strengthened and broadened the market for Morgan horses. From all of these activities it is clear that the petitioner acquired a firm knowledge of the Morgan horse business, the programs of the AMHA and the operations of Saddleback Farm. During the years 1972 through 1974 petitioner spent approximately 25 to 30 percent of his time on work directly relating to Saddleback Farm.Since the petitioner employed an acknowledged expert in the breeding and training of Morgan horses as well as having a full-time staff, it was not necessary for petitioner to take a more active role in the day-to-day operations of the farm in order to demonstrate his bona fide intention to make a profit. Section 1.183-2(b)(3), Income Tax Regs. *125 , clearly states: The fact that the taxpayer devotes a limited amount of time to an activity does not necessarily indicate a lack of profit motive where the taxpayer employs competent and qualified persons to carry on such activity. Petitioner and Herrick were both candid and credible witnesses. Petitioner and Saddleback Farm have progressed in the breeding of horses. We are convinced he intended to make a profit from his venture and he had a good faith expectation to "recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd., 379 F.2d 252 (2d Cir. 1967), cert. denied, 389 U.S. 931 (1967). We are not unmindful of the series of financial losses incurred by Saddleback Farm. Such a sustained series of losses can be evidence that a taxpayer did not intend to make a profit. Golanty v. Commissioner,supra. That factor alone, however, is not determinative. In Churchman v. Commissioner,68 T.C. 696, 699 (1977), for the 20 years that the taxpayer pursued her artistic activities, the income from the sale of her artwork did not exceed *126 her expenses in any year, yet she was found to have a bona fide intention of making a profit. In 1965 the petitioner had a loss from the operations of Saddleback Farm of over $19,000.The losses generally increased over the succeeding years until they peaked at about $66,000 in 1974. Since 1974 the losses have steadily declined. In 1975, the losses were $56,137 and in 1976 they dropped to $20,866. The farm showed a profit of $1,401 in 1977 and a profit of $4,777 in 1978. In our opinion the petitioner had a good faith expectation that the Saddleback Morgan horses would appreciate in value as the breeding program developed a more esteemed, and hence more valuable, animal. It takes from eight to twelve years for a breeding program of the type conducted at Saddleback Farm to establish quality bloodlines that are reproducible. The losses in the early years from 1965 to 1971 can be attributed to the less than competent trainers petitioner had employed. However, in 1971, with the hiring of an outstanding trainer and breeder, the breeding program was substantially expanded. Granted, there were losses in the years from 1971 to 1976; however, we think these were the result of the increased *127 breeding program, where the size of the herd rose from 20 horses in 1971 to 45 horses in 1975, finally decreasing to 25 horses in 1977 after the production sale in 1976. With the decrease in the size of the losses in 1975 and 1976 and the appearance of profits in 1977 and 1978, the Saddleback Farm appears to have turned the corner. Having a breeding herd of approximately 25 to 45 horses, petitioner, we believe, could have expected in the years at issue and later years to recoup the operating losses through the sales of a developed strain of Morgan horses. Petitioner had substantial outside income. Respondent contends this is indicative that Saddleback Farm was not operated at a profit because without such high outside income petitioner could not have sustained the steady, sizeable losses at the farm without selling the farm's assets and liquidating the activity. See Bessenyey v. Commissioner,supra;Sec. 1.183-2(b)(8), Income Tax Regs.Respondent contends that petitioner is a "gentleman farmer" looking for a tax shelter. We think this begs the question. As this Court stated in Engdahl v. Commissioner,supra: As long *128 as tax rates are less than 100 percent, there is no 'benefit' in losing money. Properly construed, the Regulation merely makes the common-sense point that the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur. The essential question remains whether there was a genuine hope of economic profit. We note the lion's share of petitioner's total income was from salary and fees rather than passive dividends and annuity payments. We think he would not be likely to squander personal service income in a hobby of such magnitude. Respondent's last argument is that petitioner received certain elements of personal pleasure or recreation from the operation of Saddleback Farm. Sec. 1.183-2(b)(9), Income Tax Regs. This argument does not persuade us that petitioner had no profit motive. He did not live at Saddleback Farm for the first 10 years of its operation. There are no swimming pools, tennis courts or hunting lodges there. Petitioner has gone to only one party for horse show exhibitors since the farm was founded in 1964. He does not ride *129 horses because of an old back injury and drives them only occasionally. The late Mrs. Appley never rode a horse in her life. Petitioner's children and grandchildren live on the West Coast and thus visit the farm and ride horses there only infrequently. While petitioner attends horse shows, he does so to congratulate the farm's riders and drivers when they win events and because it is satisfying for him to see Saddleback horses win. There is a high correlation between success in horse shows and success in the market place. Petitioner testified that it is as gratifying for him to see his horses win in the show ring as it is for Dr. Land to see the Polariod camera succeed. After careful consideration of all the facts and circumstances in this case, we conclude that the Morgan horse farm operated by petitioner as a small business corporation constituted a trade or business under section 162, and therefore that the losses incurred in such activity during the years in issue are fully deductible. To reflect the settlement of other issues and our conclusion on the disputed issue, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.↩
a. Excluding receipts from sales of horses. ↩
b. Insurance proceeds upon death of horse ↩
c. Gross rents of $193 plus prizes of $972 ↩
d. Gross rents of $1,650 plus prizes of $3,730↩
1. Before section 72 exclusion. ↩
2. Before long-term capital gain deduction. ↩
3. Reflects gross income before deductions of operating losses of Saddleback Farm Inc. ↩
4. Reflects losses from Saddleback Farm Inc. and miscellaneous adjustment to gross income.↩