HERBERT A. DUNN AND GEORGIA E. DUNN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 114–76.     Filed August 21, 1978.

*Robert M. Tyle*, for the petitioners.
*Anthony M. Bruce*, for the respondent.

TANNENWALD, *Judge:* Respondent determined deficiencies in. petitioners' Federal income tax as follows:

| Year | Deficiency |
|------|------------|
| 1970 | $50,531.75 |
| 1971 | 21,618.10 |

The issues remaining for our decision are: (1) Whether

petitioner Herbert Dunn was engaged in the trade or business of harness horse racing and breeding and (2) whether the redemption of petitioner Georgia Dunn's stock in Bresee Chevrolet, Inc., constituted a complete termination of her interest in the corporation under sections 302(b)(3)[1] and 302(c)(2).

## GENERAL FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Herbert A. Dunn and Georgia E. Dunn (Herbert, Georgia, or petitioners) resided in Liverpool, N. Y., at the time of filing the petition herein. Petitioners filed joint Federal income tax returns for 1970 and 1971 with the North-Atlantic Service Center, Andover, Mass. Herbert was born in 1893 and Georgia was born in 1897.

## FINDINGS OF FACT

### Trade or Business Issue

Herbert has been interested in horses since at least 1940. Prior to 1968, he owned various horses, which were stabled at his home and ridden by himself and his children for pleasure. He entered his horses in amateur exhibitions and horse shows to compete for ribbons.

He later became interested in harness racing. In 1968, Herbert owned "Little Pumpkin" and "Crowning Glory." "Little Pumpkin" was entered in two races at Pompano Beach, Fla., and won a total of $104. The combined winnings of the first place winners in these two races was $800. On his 1968 Federal income tax returns, Herbert disclosed a net loss of $8,967.65 from the operations of his racing stable, including wagering. Petitioner took no deduction for this loss because, during 1968, Herbert considered himself an amateur and his racing activities as not being carried on for profit.

In 1969, Herbert informed his lawyer that he contemplated retiring from the automobile business (see p. 721 *infra* ) and that he wanted his harness horse racing and breeding to be his future

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue.

business. Upon his lawyer's advice, he retained a certified public accountant to prepare the appropriate schedule for his income tax return.

In 1969, Herbert continued to own "Crowning Glory" and he acquired "Miss Linda Sharp" and "Straight Shot." He did not enter any horses in races in 1969.

In 1970, Herbert continued to own "Crowning Glory" and acquired "Henry Knauf." "Miss Linda Sharp" and "Straight Shot" were sold at losses of $1,680.23 and $2,182.28, respectively, which petitioners deducted as losses from the sale of section 1231 property. Prior to his sale, "Straight Shot" was entered in 11 races at Saratoga Springs, N. Y., winning a total of $734. The combined winnings of first place horses in these races was $4,200. "Straight Shot" was also entered in a "New York Sire Race" at Buffalo, N. Y., where he finished fourth and won $627.35. The winner of this race won $3,921. None of Herbert's other horses were entered in races in 1970.

In 1971, Herbert continued to own "Henry Knauf" and "Crowning Glory." For the first time, he took a deduction for depreciation with respect to "Crowning Glory." "Henry Knauf" was entered in two races at Vernon Downs, Vernon, N. Y., where he won $93.75 for fifth place in one race and nothing in the other. The winner in the former race won $937.50. "Crowning Glory" was not entered in any races in 1971.

Herbert continued to own "Crowning Glory" throughout 1972. "Henry Knauf" was sold at a loss in that year. Prior to his sale, he was entered in four races at Pompano Beach, where he won a total of $219, and was entered in eight races at Saratoga Springs, where he won a total of $240. The combined first place winnings in all these races was $11,570. "Crowning Glory" was not entered in any races in 1972.

Subsequent to 1972, Herbert began winding down his horse racing and breeding activities and did not enter any more races. In each of the years 1973 and 1974, he sold a foal. He continued to own "Crowning Glory" until 1975.

Herbert conducted his harness racing and breeding activities in both New York State and Florida. In 1970 and 1971, petitioners spent the winter in Florida.

On their tax returns for 1969 through 1975, petitioners reported on Schedule C (Profit/or Loss from Business or Profession) all income from Herbert's breeding and harness

racing activities and deducted expenses such as board and training, stud fees, association fees, drivers, and accounting fees.

The financial aspects of Herbert's horse racing and breeding activities may be summarized as follows:

| Year | Gross receipts[1] | Deductions | Profit (loss) |
|---|---|---|---|
| 1968[2] | $5,032.35 | $14,000.00 | ($8,967.65) |
| 1969 | 4,263.50 | 9,677.66 | (6,096.65) |
| 1970 | 1,230.35 | 20,860.85 | (19,630.50) |
| 1971 | 93.00 | 14,015.55 | (13,922.55) |
| 1972 | 1,796.00 | 13,140.96 | (11,344.96) |
| 1973 | 1,400.00 | 4,219.21 | (2,819.21) |
| 1974 | 4,250.00 | 3,795.92 | 504.08 |
| 1975 | 1,500.00 | 1,144.00 | 356.00 |

---

[1] Gross receipts exceed the amounts received from harness racing, but the record does not contain the source of the excess.
[2] Figures for 1968 include income and losses from wagering.

Petitioners' reported taxable income for the years 1968 through 1974 was as follows:

| Year | Taxable income | Year | Taxable income |
|---|---|---|---|
| 1968 | $18,847.80 | 1972 | $24,315.56 |
| 1969 | 44,706.86 | 1973 | 34,181.34 |
| 1970 | 38,440.77 | 1974 | 57,123.40 |
| 1971 | 31,317.74 | | |

On October 31, 1972, Herbert, but not Georgia, signed a letter electing, pursuant to section 183(e), to defer the determination of whether the presumption in section 183(d) applies until the close of calendar year 1976.

## ULTIMATE FINDING OF FACT

Herbert did not carry on a trade or business or engage in an activity for profit during the taxable years 1970 and 1971.

## OPINION

The question before us is whether Herbert's harness horse racing and breeding activities constitute a trade or business, as petitioners contend, or an activity not engaged in for profit, as respondent contends. Petitioners' entitlement to deductions for net operating losses and for ordinary losses incurred in the sale

of horses is dependent upon our resolving this issue in their favor.

Section 183(d) provides that, if for any 2 of 7 consecutive taxable years (in the case of an activity which consists in major part of the breeding, training, showing, or racing of horses) the gross income derived from such activity exceeds the deductions, the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. If the taxpayer so elects under section 183(e), the applicability of the presumption shall not be determined before the close of the sixth taxable year following the year in which the taxpayer first engages in the activity. For this purpose, a taxpayer is treated as not engaged in any activity in a year beginning before January 1, 1970. In the event of such an election, the presumption shall apply to each taxable year in the 7-year period beginning with the first year in which the taxpayer engages in the activity, subject to certain conditions.

The Commissioner contends that Herbert's purported election is invalid because not signed by Georgia. See section 12.9, Income Tax Regs., adopted as temporary regulations under section 183(e) by T.D. 7308, 1974–1 C.B. 64, and not yet made permanent. Petitioners urge us to give the election effect because they were told by respondent's agent that only Herbert need sign the election and the temporary regulation on which respondent relies was not published until March 1974, 17 months after Herbert signed his purported election. We find it unnecessary to resolve this dispute because, even assuming arguendo that the election is valid (compare *Forrester v. Commissioner*, 49 T.C. 499 (1968), with *Corn Belt Hatcheries of Arkansas, Inc. v. Commissioner*, 52 T.C. 636 (1969)), we think respondent has established that Herbert's activities were not engaged in for profit.

An activity not engaged in for profit under section 183 is the other side of the coin of a trade or business under section 162. Section 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." The legislative history indicates that Congress intended to codify the distinction between a business and a hobby drawn by case law. H. Rept. 91–

413 (Part 1) 71 (1969), 1969–3 C.B. 200, 245; S. Rept. 91–552,103 (1969), 1969–3 C.B. 423, 489.

The test of whether an individual is carrying on a trade or business for purposes of section 162 depends upon his primary or dominant motive, i.e., is it to make a profit. *Godfrey v. Commissioner*, 335 F.2d 82, 84 (6th Cir. 1964), affg. T.C. Memo. 1963–1; *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. T.C. Memo. 1961–256; *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976). The taxpayer's expectation of profit need not be reasonable, but it must be a good faith expectation. *Mercer v. Commissioner*, 376 F.2d 708, 710–711 (9th Cir. 1967), revg. T.C. Memo. 1966–82; *Hirsch v. Commissioner, supra; Benz v. Commissioner*, 63 T.C. 375, 383 (1974).

Whether Herbert had the requisite profit motive is a question of fact to be determined on the basis of the entire record. *Jasionowski v. Commissioner, supra* at 319. The regulations set forth the relevant factors, derived from prior case law, which are to be considered in determining the applicability of section 183. *Jasionowski v. Commissioner, supra* at 320; *Benz v. Commissioner, supra*. The regulations further provide that no one factor is conclusive and, thus, we do not reach our decision herein by merely counting the factors which support each party's position. Sec. 1.183–2(b), Income Tax Regs.

Because of health constraints, Herbert was unable to testify and we must reach our decision on the basis of objective factors contained in the record. Analysis of these factors convinces us that Herbert had no bona fide expectation of profit. We recognize, as petitioners point out, that it takes time to develop a successful breeding and horse racing business. However, on the facts of the record herein, we are convinced that Herbert's activities were not potentially profitable. Compare *Bessenyey v. Commissioner*, 45 T.C. 261, 274–275 (1965), affd. 379 F.2d 252 (2d Cir. 1967), and *Sabelis v. Commissioner*, 37 T.C. 1058, 1062 (1962). In 1969, Herbert did not enter his horses in any races and thus a loss was inevitable. In 1970, only "Straight Shot" was entered in races. Yet, even if "Straight Shot" had won each of the 12 races with total prize money of $8,121, Herbert would still have sustained a loss of $12,872.85. In 1971, only "Henry Knauf" was entered in races and he won only $93.75. While the record does not indicate the total first-place prize money in the two races in which "Henry Knauf" was entered, assuming a total of $2,000

(based upon evidence of first-place money in races in other years) and first-place finishes, Herbert's activities would still have resulted in a loss of $12,016.30. In 1972, "Henry Knauf" was entered in 12 races, with total first-place prize money of $11,570. If he had won every race (an unlikely prospect given the number of races), Herbert's loss of $11,344.96 would have been reduced to $233.96. Following 1972, Herbert decided to wind down his activities and entered no horses in races. In 1974 and 1975, he did earn a small profit, but, since he was essentially liquidating his operation during those years, we think this fact is entitled to little weight as evidence of a profit motive.

We are further influenced by the fact that Herbert was 76 years old in 1969, an advanced age for embarking on any new business and particularly one that takes time to develop. Moreover, the fact that Herbert had always been interested in horses and had actively pursued this interest in other ways strongly indicates that his activities were a hobby, rather than a business. Sec. 1.183–2(b)(9), Income Tax Regs. See *Benz v. Commissioner, supra* at 385; *Bessenyey v. Commissioner, supra* at 274–275.

We are unimpressed by the few outward manifestations of a business (hired trainers, an accountant to prepare the appropriate schedule for their tax return) upon which petitioners base their position. In short, we are convinced that Herbert's activities were not operated on a basis which supports the conclusion of good faith expectation of profitability and there is no evidence of a plan of development that would change this situation. See sec. 1.183–2(b)(6). Nor is there any other evidence that persuades us that Herbert's profit motive, while unreasonable, was nevertheless bona fide. Compare *Mercer v. Commissioner, supra.*

*Redemption Issue*

Bresee Chevrolet Co., Inc. (Bresee or the company), is a car dealership franchised by General Motors (GM) and located in Syracuse, N. Y. Georgia acquired all of the stock of the company through inheritance from her parents and purchase from others in 1936. Until about 1951, Herbert was president of the company. Thereafter, her son William B. Dunn served as president. Herbert continued as an employee until he retired in 1973.

Beginning in 1951, Georgia made gifts of stock to her children

so that as of June 1, 1970, the stock of the company was owned as follows:

| Stockholder | Relationship to Georgia | Number of shares |
|---|---|---|
| Georgia | | 249 |
| Jane D. Harris | daughter | 51 |
| Patricia Bowen | daughter | 51 |
| William B. Dunn | son | 149 |

On June 1, 1970, Bresee redeemed all of Georgia's remaining shares. GM had been pressing her for some time to dispose of her stock because they wanted her son, who was the president of the company, to own a majority of the stock. Georgia desired to dispose of her stock because she was advised that it created liquidity problems from an estate planning point of view and because she and her husband wanted additional income as they advanced in age, and Bresee, with one exception, had not in the past paid dividends. She also wished to spend most of her time in Florida and did not want to have any business responsibilities.

Georgia and the company were represented by separate counsel in negotiations regarding a stock redemption. The parties reached an agreement whereby Bresee would redeem Georgia's shares, which provided for payment of $335,154 as follows:

a. The sum of ONE HUNDRED THOUSAND DOLLARS ($100,000.00) on June 1, 1970.

b. The balance amounting to TWO HUNDRED THIRTY-FIVE THOUSAND ONE HUNDRED FIFTY-FOUR DOLLARS ($235,154.00) by the Purchaser executing and delivering a promissory note made payable to the Seller, in said amount of $235,154.00, bearing interest to be computed at the rate of Five Percent (5%) per annum, and made payable as follows:

"The sum of FIFTY-FIVE THOUSAND ONE HUNDRED FIFTY-FOUR DOLLARS ($55,154.00) of principal, together with interest computed on said principal indebtedness of $235,154.00 from June 1, 1970 at the rate of 5% per annum, shall be due and payable on June 1, 1971.

Thereafter commencing with June 1, 1972, and continuing for a period of ten (10) years, regular annual payments covering principal and interest computed at the above rate in the constant amount of $23,311.80 each shall be due and payable on the 1st day of June of each year until June 1, 1981. Each of said annual payments of $23,311.80 shall be first applied in payment of interest computed at the rate of 5% per annum on the respective unpaid principal balances, and the balance of each payment shall then be applied in the reduction of the principal indebtedness then remaining unpaid."

The agreement was subject to the approval of GM, and, in order to obtain that approval, the parties provided that Bresee would not be required to make any payment which would reduce its "owned net working capital"[2] below whatever amount was required by its franchise agreement or would prevent Bresee from retaining 50 percent of the previous year's net profits after taxes. If any payment of any installment would violate said provisions, the due date of such installment would be postponed until such time as it could be made without violating the provisions.

The agreement further provided that Bresee would not take any action such as excessive purchases, declaring or paying dividends, increases in officers' salaries, or abnormal increases in indebtedness which would affect its ability to make timely payments to Georgia. Bresee further agreed that it would borrow against life insurance policies on Georgia's life owned by it in order to make the first two payments.

On November 1, 1970, Bresee entered into a new Minimum Capital Standard Agreement with GM, whereby it agreed to increase its "minimum owned net working capital" from $329,569 to $732,266 by October 31, 1971, and to retain 75 percent of its net profits after taxes until such time as it had increased its working capital as required.

GM approved the agreement.[3] Bresee made the first payment of $100,000 on June 1, 1970, with proceeds from a loan against life insurance. On June 1, 1971, Bresee's financial condition was such that it could not make its payments to Georgia without violating the restrictions imposed by GM. Accordingly, Georgia was paid only $45,260.34 in principal and no interest. The cash for the payment was raised by selling real estate.[4] The balance of the June 1, 1971, principal payment was paid on June 13, 1972, and the interest due on June 1, 1971 ($11,757.70), was paid on September 13, 1974.

Payments of principal and interest were made as follows:

---

[2]"Owned net working capital" was defined to mean the amount of net working capital which should be supplied by investment and earnings.

[3]There is no specific evidence that General Motors approved the redemption agreement, but such approval can clearly be inferred from the record.

[4]The stock redemption agreement provided that this payment would be made with proceeds from a loan against life insurance policies on Georgia's life. The record contains no explanation for Bresee's failure to make payment by the agreed means.

| Date due | Principal due | Date paid |
|----------|---------------|-----------|
| June 1, 1972 | $14,311.80 | June 18, 1973 |
| June 1, 1973 | 15,027.39 | May 29, 1974 |
| June 1, 1974 | 16,567.70 | Oct. 15, 1975 |
| June 1, 1975 | 17,396.08 | July 27, 1976 |

| Date due | Interest due | Date paid |
|----------|--------------|-----------|
| June 1, 1972 | $11,757.70 | June 13, 1972 |
| June 1, 1973 | 9,000.00 | June 18, 1973 |
| June 1, 1974 | 8,284.41 | May 29, 1974 |
| June 1, 1975 | 6,744.10 | Oct. 15, 1975 |
| June 1, 1976 | 5,915.72 | July 27, 1976 |

Each time a payment was made, Bresee was in violation of its Minimum Capital Standard Agreement, although its net working capital was increasing each year. GM was not specifically informed of the payments, but did receive monthly balance sheets and profit and loss statements. GM never objected to the payments made by Bresee to Georgia.

Bresee was the largest Chevrolet dealer between Buffalo and Albany.

Following the redemption of her stock, Georgia was not an officer, director, or employee of Bresee. At the time of trial, she had not acquired any stock in Bresee. Georgia filed the agreement required by section 302(c)(2)(iii) with her 1970 tax return.

## OPINION

This issue is whether amounts received by Georgia in redemption of her Bresee stock are ordinary income, as respondent contends, or capital gain, as petitioners contend.

Section 302(a) provides that a distribution of property to a shareholder by a corporation in redemption of stock will be treated as a sale or exchange of the stock if the redemption falls into one of four categories enumerated in section 302(b). Under section 302(d), all redemptions which do not meet a specific statutory exception are treated as distributions under section 301 (i.e., a dividend to the extent the corporation has earnings and profits and the balance as a return of capital).

Under section 302(b)(3), a shareholder is entitled to exchange treatment if all the stock owned by that shareholder is redeemed. Georgia is treated as the owner of her children's stock

under the attribution rules of section 318 unless she meets the requirements of section 302(c)(2), which provides, in relevant part, that the attribution rules do not apply to a complete redemption of all the stock owned by a shareholder if "immediately after the distribution the distributee has no interest in the corporation (including an interest as officer, director, or employee) other than an interest as a creditor" and the agreement required by section 302(c)(2)(A)(iii) is filed. Thus, unless that subsection is applicable, all of her stock is not considered to have been redeemed.

Georgia filed the required agreement and did not remain as an officer, director, or employee of Bresee. Thus, the focal point of the dispute herein is whether Georgia retained an interest "other than an interest as a creditor."

At the outset, we think it important to establish certain guidelines for our analysis of the issue thus posed.

First, we do not have a situation where the attribution rules clearly apply and the question is whether such application can be avoided by considerations of business purpose. *United States v. Davis*, 397 U.S. 301 (1970). In this case, we are faced with the threshold question of whether Georgia falls within the creditor exclusion from the distributee category so that the attribution rules simply do not come into play. In this context, we do not feel compelled to apply the mandate of *Davis* that business considerations are irrelevant.

Second, the determination of whether a taxpayer has "an interest other than as a creditor" concededly requires consideration of the plethora of cases in the debt-equity arena. Most of these cases involve situations where the taxpayer retained a stock interest and sought a dual status—as a creditor as well as a shareholder—a factor which is not present herein. Moreover, analysis of those cases has been described as "distinguishing the indistinguishable" (see W. Plumb, "The Federal Income Tax Significance of Corporate Debt: A Critical Analysis and a Proposal," 26 Tax L. Rev. 369, 640 (1971)), and, in any event, the relative weight to be given the various considerations which enter into the decisional process in that arena is not necessarily the same in every context. Such variable contextual application finds support in section 385, enacted by section 415(a) of the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, which authorized the Secretary of the Treasury to prescribe regula-

tions (which he has not yet even proposed) to determine whether an interest in a corporation should be treated as "stock or indebtedness" and in the underlying legislative history. See S. Rept. 91–552, pp. 138–139 (1969), 1969–3 C.B. 423, 511–512. Cf. *Commissioner v. Brown*, 380 U.S. 563, 578 (1965).

Third, we note that there is not the slightest suggestion in the record that the transaction herein was not bona fide and that the interposition of conditions of payment relating to the requirements of GM was contrived so as to give colorable support to a transaction which otherwise would be suspect as a scheme for tax avoidance. See *Lewis v. Commissioner*, 47 T.C. 129, 135 (1966); *Curry v. Commissioner*, 43 T.C. 667, 695 (1965).

With the foregoing guidelines in mind, we proceed to analyze the facts herein in light of section 1.302–4(d), Income Tax Regs., which provides:

(d) For the purpose of section 302(c)(2)(A)(i), a person will be considered to be a creditor only if the rights of such person with respect to the corporation are not greater or broader in scope than necessary for the enforcement of his claim. Such claim must not in any sense be proprietary and must not be subordinate to the claims of general creditors. An obligation in the form of a debt may thus constitute a proprietary interest. For example, if under the terms of the instrument the corporation may discharge the principal amount of its obligation to a person by payments, the amount or certainty of which are dependent upon the earnings of the corporation, such a person is not a creditor of the corporation. Furthermore, if under the terms of the instrument the rate of purported interest is dependent upon earnings, the holder of such instrument may not, in some cases, be a creditor.

Respondent, relying on a literal interpretation of his regulation, asserts that *any* indicia of a proprietary interest is fatal, that there are several such indicia in the instant case, and that consequently Georgia fails to meet the requirement that her claim "must not *in any sense* be proprietary." (Emphasis added.) Recognizing that in interpreting a regulation "the courts should if possible avoid a construction which will bring into question" its validity (see *Steen v. Commissioner*, 61 T.C. 298, 304 (1973), affd. per curiam 508 F.2d 268 (5th Cir. 1975)), we are satisfied that a proper reading of section 1.302–4(d), Income Tax Regs., does not accord with respondent's literal interpretation. Cf. *Estate of Lennard v. Commissioner*, 61 T.C. 554 (1974).

Respondent argues that Georgia's claim was voluntarily subordinated to the claims of general creditors because some payments were deferred. He assumes that Bresee was paying all

its creditors because it continued in business. While it is not clear from the record whether Bresee in fact paid all its creditors currently, even if such were the case, we think that the record herein does not support respondent's assertion regarding subordination, which, at a minimum, implies some voluntary act or failure to act on the part of the creditor.[5] The mere fact that Georgia may not have been paid while other creditors were is not sufficient in and of itself to constitute subordination. Moreover, we are satisfied that Georgia pressed for payment and expected payment. Additionally, since every payment made was in excess of that permitted by the GM restrictions, she was receiving more than she was entitled to under the terms of the agreement.[6] In short, we are unable to find subordination in the ordinary understanding of that term. Finally, we note that we have only recently held that subordination, if it exists, is only one of several factors to be taken into account. *Estate of Lennard v. Commissioner, supra.*

Respondent attempts further to support his position that Georgia retained "an interest other than as a creditor" by arguing that Bresee did not have a good record of timely compliance with its obligations to make payments to her. See *Piedmont Corp. v. Commissioner*, 388 F.2d 886, 891 (4th Cir. 1968), revg. T.C. Memo. 1966–263; *Baker Commodities, Inc. v. Commissioner*, 48 T.C. 374, 397–398 (1967), affd. 415 F.2d 519 (9th Cir. 1969). We think this argument is belied by the record. First, with the exception of the June 1971 payment, interest payments were made regularly, albeit the 1975 and 1976 payments were a few months late. Moreover, although principal payments were running about a year behind, they were being made on a fairly regular basis. Cf. *Bullock v. Commissioner*, 26 T.C. 276, 295 (1956), affd. per curiam 253 F.2d 715 (2d Cir. 1958). And, as we have previously pointed out, payments were made in excess of the amounts permitted by the agreement.

---

[5]Respondent does not argue that Georgia's claim was subordinated pursuant to the terms of the agreement. Subordination may be considered implicit in the fact that her right to payment is dependent on earnings because of the GM restrictions. Respondent's argument with respect to these restrictions is discussed at pp. 728–729 *infra.*

[6]We note that the stock redemption agreement provided that the 1970 and 1971 payments could be made without affecting or decreasing the "present 'Owned Net Working Capital.'" However, the parties stipulated that the June 1, 1971, payment would have violated the Minimum Capital Standard Agreement dated *November 1, 1970.* The change in the effect of the payment is apparently due to the fact that a new Minimum Capital Standard Agreement was executed subsequent to the redemption agreement.

Finally, we deal with respondent's attempt to buttress his position on the basis of the restrictions imposed by virtue of the arrangements between Bresee and GM. In one breath, he points to the fact that there is some evidence: (1) That the parties did not expect the restrictions to be enforced; and (2) that payments were consistently made in excess of the amounts permitted by those restrictions. On this basis, he argues that we should give little, if any, weight to the restrictions. Perhaps if there had been a substantial stretchout of payments beyond the terms set forth in the agreement between Georgia and Bresee, respondent's position would be entitled to greater consideration. But the fact is that the agreed timetable was substantially complied with and respondent has not suggested that a 12-year payout is per se of such a length as to make Georgia's interest "other than an interest as a creditor." See Rev. Rul. 57–295, 1957–2 C.B. 227; cf. *Lisle v. Commissioner*, T.C. Memo. 1976–140.

In the next breath, respondent seizes upon the fact that the incorporation of the restrictions imposed by GM into the agreement between Georgia and Bresee produced a situation where the payments to Georgia were dependent upon earnings and (at least in theory) could by postponed indefinitely. He goes on to argue that this caused Georgia to have a proprietary interest (cf. *Curry v. Commissioner, supra; Duerr v. Commissioner*, 30 T.C. 944, 947 (1958)) in contravention of the provision of section 1.302–4(d), Income Tax Regs., which states—

For example, if under the terms of the instrument the corporation may discharge the principal amount of its obligation to a person by payments, the amount or certainty of which are dependent upon the earnings of the corporation, such a person is not a creditor of the corporation.

We think respondent pushes his regulation beyond its intended meaning. Perhaps if the parties to an agreement inter sese voluntarily construct such an arrangement, it could be said to fall within the example as being "under the terms of the instrument." But, we think this portion of the regulation (which, after all, is only an example) should not be elevated into a rule of law which would automatically include restrictions derived from conditions which are in fact imposed, as is the case herein, by a third party in order to accomplish that person's legitimate business objectives, and where there is no evidence that it served

an additional purpose of furthering the interests of the actual parties to the redemption agreement.[7] We are satisfied that the inclusion of restrictions on payment, at least where they are imposed by an independent third party, should be simply one factor out of several in determining whether a person retains an interest "other than an interest as a creditor" within the meaning of section 302(c)(2)(A)(i) and respondent's regulations thereunder. Cf. *Albers v. Commissioner*, 414 U.S. 982 (1973) (denial of certiorari, Judge Powell dissenting, in a section 302(b)(1) case involving preferred stock issued at insistence of Federal Maritime Commission); *Harlan v. United States*, 409 F.2d 904, 909 (5th Cir. 1969) (restriction on payments of notes required by law); *Commissioner v. Union Mutual Insurance Co. of Providence*, 386 F.2d 974, 976–978 (1st Cir. 1967), affg. 46 T.C. 842 (1966) (restrictions required by terms of corporate charter).[8]

It is clear from the record that Georgia wanted to terminate her interest in Bresee so that she could have income and more liquid assets and could spend more time in Florida without concern for business affairs in New York. The company wanted to redeem her interest because of pressure to do so from GM. Under the circumstances of this case, the redemption of Georgia's stock constituted a bona fide severance of her interest in Bresee within the intended purpose of section 302(c)(2). H. Rept. 1337, 83d Cong., 2d Sess. 35 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 45 (1954). The factors relied upon by respondent, applied within the appropriate boundaries of interpretation of section 1.302–4(d), Income Tax Regs., do not mandate a contrary conclusion. Accordingly, Georgia is entitled to capital gain treatment with respect to the proceeds of the redemption. Sec. 302(a).

*Decision will be entered under Rule 155.*

---

[7]In this connection, we note that it can clearly be inferred from the record that, absent GM's insistence, Georgia and Bresee would not have included such restrictions in the agreement.

[8]Cf. also *Lisle v. Commissioner*, T.C. Memo. 1976–140 (restrictions required by local law did not result in interest other than as a creditor); *Wilson & Fields v. Commissioner*, T.C. Memo. 1962–200 (restrictions imposed by FHA regulations); *Oak Motors, Inc. v. Commissioner*, T.C. Memo. 1964–86 (terms arranged to comply with minimum net worth requirement of Ford Motor Co.).