T.C. Memo. 1995-510


UNITED STATES TAX COURT


JAY M. ANDERSON AND HELEN B. ANDERSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22524-93.                    Filed October 26, 1995.


Jay M. Anderson, pro se.

<u>Jeanne Gramling</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARKER, <u>Judge</u>:  Respondent determined a deficiency in petitioners' Federal income tax in the amount of $12,870 and an addition to tax under section 6651(a)(1) in the amount of $1,553 for the taxable year 1989 and a deficiency in the amount of $2,867 for the taxable year 1990.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years before the Court, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by both parties,[1] the remaining issue for decision is whether petitioners may deduct depreciation in the amount of $33,333 in each of the taxable years 1989 and 1990 for a prototype automobile built by petitioner Jay M. Anderson.[2]  In reaching our decision, we must decide:  (1) Whether petitioner Jay M. Anderson was engaged in a trade or business related to the automobile or held the automobile for production of income or, conversely, whether the activity related to the automobile was one "not engaged in for profit" within the meaning of section 183, and (2) whether petitioner has substantiated his basis in the automobile.

---

[1] Respondent conceded the issue of the sec. 6651(a)(1) addition to tax for the taxable year 1989.  Petitioners conceded the following adjustments to income:

|                                  | 1989  | 1990   |
|----------------------------------|-------|--------|
| Capital gains                    | $960  | $13,350 |
| Depreciation-mortgage business   | (350) | 825    |
| Auto rental expense              | (51)  | --     |
| Depreciation-rental property     | --    | 381    |
| Miscellaneous itemized deductions | 3,534 | 2,096  |
| Other car expenses               | 4,933 | --     |

[2] That decision also will determine petitioners' medical expense deductions for 1989 and 1990, and the self-employment tax for 1990, since the adjustments to these items are purely computational.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, supplemental stipulation of facts, and the exhibits attached thereto are incorporated herein by this reference.

Petitioners resided in Roanoke, Virginia, at the time they filed the petition in this case. The term petitioner in the singular will refer to Jay M. Anderson.

In 1980, petitioner began working on a design for a high fuel/mileage automobile, which he called the "J Morgan I" car (the J car). In the preceding 5 years, he had read extensively on the subject of automobile manufacturing and performance but otherwise had no experience in the field. From his reading, he perceived that there existed an interest in high mileage cars; i.e., cars that would get 100 or more miles per gallon. He did not, however, consult any automobile manufacturers or conduct any market surveys or studies regarding the feasibility of or interest in such a car.

On May 21, 1981, petitioner purchased Williams Auto Alignment (the auto shop) with $40,000 borrowed from First National Bank of Roanoke. He operated the auto shop as a sole proprietorship at first, but incorporated the business in 1984. The auto shop provided petitioner with a facility and personnel to assist in building the car. The ongoing business of the auto shop was to perform wheel alignments, for which it charged

$18.50. Occasionally, the auto shop would replace ball joints or straighten a frame; for the latter, the charge was $800 to $900. Petitioner testified that frame jobs were rare, occurring only two or three times during the years he owned the auto shop.

Petitioner began his construction of the J car by using the frame of a 1965 Triumph Spitfire on which he built a fiberglass body. Petitioner built the fiberglass body of the car by hand, rather than from a mold. He did not hire anyone to design and construct a mold first because he believed that the cost would be prohibitive and that, since he could not draw, he would be unable to convey to such a person what he had in mind as to the body design. According to petitioner, once he was satisfied with the body, he then had someone else prepare a drawing of the car. Petitioner did not produce this drawing at the trial, and the record does not disclose the degree of accuracy or detail with which the drawing was prepared. Petitioner indicated that he sent this drawing to Virginia Polytechnic Institute for an assessment of the car's aerodynamic qualities. Petitioner said he was satisfied with the results of the assessment[3] and left his design as it was at that time.

_____

[3] Petitioner testified that Virginia Polytechnic Institute found the design to be "97 percent aerodynamically correct." Petitioner presented no documentation of these results and did not explain what, if anything, such results meant in relation to the ultimate manufacture or operation of the J car. Presumably the aerodynamics of the body would affect its mileage per gallon of fuel.

By 1985, petitioner had completed about 80 to 90 percent of the J car; only some body work remained to be done. A diesel engine had been installed, and the mechanical and running gear was installed and operative. The J car weighed 1,275 pounds and had a fiberglass body, a Kubota diesel engine, 3-in-line cylinders, a four-speed overdrive transmission, front disk brakes and rear drum brakes, and Michelin radial tires. The rear end came out of an old MG. Petitioner estimated that the car would go 70 miles per hour at top speed, but it would have poor acceleration characteristics. Petitioner tested the J car using a meter gauge to determine its mileage per gallon, which petitioner estimated to be 116.7 miles per gallon of diesel fuel. By 1985, 99 percent of the cost of building the J car had been incurred.

Petitioner testified that he paid for the expenses related to the development of the J car by using 20 to 30 credit cards to reimburse the auto shop and by borrowing money from several sources. None of these expenses has been substantiated. In 1985, when the City of Roanoke experienced a flood, petitioner lost his records related to the expenses for building the J car. Petitioner has not made an attempt to reconstruct those records. Petitioner did have the stubs to the auto shop's checkbook for some portions of the period of May 29, 1981 through October 25, 1985.

At trial, petitioner opined that a large portion of the costs of the J car could be determined by examining the deposits into the auto shop's checking account as written on those check stubs. However, the sources of the deposits were not indicated on the stubs, only the dates and amounts. Petitioner suggested that one easily could distinguish the deposits related to petitioner's payments for car expenses, as their amounts were substantially larger than the $18.50 normally received by the shop for alignments. By this method, petitioner's tally of the deposits he claimed were related to the J car totaled $44,566 for 42 months. From this, he determined an average per-month figure of $1,061 and calculated the amounts spent during the months missing from the check stubs to be another $18,038 ($44,566 ÷ 42 x 17) for 17 months, for a total of $63,681.[4] However, petitioner did not own the auto shop for 59 months. Petitioner presented no supporting bank account or credit card statements. He also did not provide any evidence that the auto shop had paid for the car expenses and, if the auto shop had paid such expenses, that such had not been deducted either on petitioner's

[4] Petitioner made several arithmetical errors in his computations. The deposit amounts that petitioner read into the record (which figures are the same figures the Court wrote down during the trial) do not add up to petitioner's subtotal of $27,489 in the transcript or his total of $44,566. Moreover, the Court could not verify all of those deposit amounts from the check stubs in evidence. Finally, the $44,566 and $18,038 sums add up to $62,604, not $63,681, but since there are errors in both of those sums, it serves no useful purpose to correct the total figure.

Schedules C for the auto shop or on the later corporate returns of the auto shop.

In 1985, petitioner sold the auto shop. At that time he drove the J car, without windows or a muffler, the 5 miles to his home. This is the only mileage that has ever been put on the J car. By the time the J car was moved to petitioner's home, some 99 percent of the costs of the car had been incurred. Thereafter petitioner merely invested his time and labor in completing the vehicle.

On August 19, 1986, petitioner filed a petition in the Bankruptcy Court for the Western District of Virginia seeking relief under Chapter 13 of the Bankruptcy Code. Petitioner's debts included unpaid withholding tax for the auto shop, bank loans for real estate purchases, and some unsecured debts possibly including unpaid credit card charges. In his bankruptcy petition, petitioner listed among his personal property the J car, describing it as a 1965 Spitfire worth $1,000. It was listed according to its frame. The J car was never titled with the State motor vehicle authority and has never been insured. In August of 1986, the J car had been disassembled, and its parts were lying all over petitioner's garage. Petitioner claims that he valued the car at $1,000 because of its then disassembled condition.

From 1986 until 1989, petitioner worked on finishing the J car at home. He reassembled the J car and put on the lacquer

coating and wax. He broke two windshields and, as of the date of the trial, had not solved this windshield problem. The J car is now stored in petitioner's garage; he starts the engine every 6 weeks.

The J car is only a prototype and is not intended for street use. The design of the J car is unusual in that it has snap-out upholstery, a dash that will lie flat, and a body attached by only eight bolts. The body of the J car was intended to be used to make a mold with which other car bodies can be made. Although petitioner estimated the cost of making such a mold to be $3,500, a figure he termed "not a big expense", he never made the mold needed to reproduce the body. Petitioner suggested that today he could make the J car for about $7,500 per car. Petitioner explained that should someone purchase a copy of the J car and the body of that vehicle be damaged, the owner could order a new body from petitioner and easily reassemble the vehicle. Petitioner suggested he could make such a replacement fiberglass body for $300 to $350 in 1989 and $500 today.

Petitioner has never sought and does not have a patent on the J car's design or on any of its parts, nor does he have any plans of that design drawn up or otherwise reproduced. Most of the J car was constructed from old or new parts of other types of automobiles. Petitioner's principal contribution appears to have been in the unusual and attractive shape of the fiberglass body. The J car looks like an upscale two-seater sports car, but it

does not have sports car speed or acceleration characteristics. The unique characteristic of the J car is its purported fuel efficiency, which petitioner attributes to its lightweight fiberglass body and its gear ratios. The claimed 116.7 miles per gallon has never been certified or otherwise verified.

In 1989, petitioner began making attempts to sell copies of the car through personal contacts and advertisements. He identified those radio stations that would charge for commercials on a per-inquiry basis;[5] petitioner testified that two or three California radio stations ran his advertisements under this arrangement. Petitioner also testified that he sent flyers to numerous automobile magazines, both in the United States and Europe. Supposedly, two magazines in Europe published the information; however, petitioner could not remember the names of the magazines. Nor could he remember the local publications with which he had placed advertisements. The flyers listed the sales price as $14,500, plus an additional $2,500 for a turbocharged model. The flyers claimed the gas mileage was 116.7 miles per gallon, although this mileage had not been certified or otherwise established. Petitioner did not receive any orders for the car, and no sales resulted from these advertisements or his personal contacts.

---

[5] The cost of the advertisement was determined by the number of responses received, with no initial charge for placing the advertisement.

Petitioner decided at some point that he would try to sell or license the J car itself to an automobile manufacturer. He wanted a flat sum, plus a certain amount per each unit the manufacturer made. He received an inquiry from an individual in Texas who had a corporate shell and was looking for an operating business to place in his shell. That person thus was not interested in petitioner's proposed venture. Petitioner related that he declined the offer of a company in Brazil that wanted to exchange $100,000 of its stock for the car, plus $50 per each car made.[6] Petitioner did not want stock that was not traded publicly, and the company apparently would not guarantee that a specific number of units would be manufactured. Petitioner wanted a guarantee of a minimum of 1,000 units. This offer, whatever its terms, was never put in writing.

Petitioner testified that during the years at issue he spent about 25 hours per week on the J car activity; however, the few activities detailed above were rather brief and sporadic and could not have consumed that much time. During this time,

---

[6] Petitioner's friend put him in contact with an individual who had been dealing with the Brazilian company. That individual had a patent on a new motor and was searching for a car in which to use his motor. It is not clear whether petitioner dealt just with that patent holder or dealt directly with a representative from the Brazilian company.

petitioner also ran a mortgage loan business.  Petitioners'
taxable income was derived from the following sources:[7]

| Source | 1989 | 1990 |
|--------|------|------|
| Interest | $5,002 | $2,011 |
| Mortgage Business | (3,567) | 5,079 |
| Rental Income | (1,743) | (1,196) |
| Capital Gains | 107,737 | 18,215 |
| Total Income | $107,428 | $24,108 |

Petitioners filed joint Federal income tax returns for the
taxable years 1989, 1990, and 1991.  In each of these years,
petitioner deducted $33,333 in depreciation for the J car on a
Schedule C.  He reported no income from this activity in any of
the years.  Respondent disallowed the depreciation deductions
related to the car on the ground that petitioner was not engaged
in a trade or business for profit or an activity for production
of income.  The year 1991 is not before the Court.

### OPINION

The issue is whether petitioner may deduct depreciation for
the J car in the amount of $33,333 per year for the taxable years
1989 and 1990.  Petitioner contends that he was engaged in the
business of selling the car, or copies of it, during the years at
issue and that the car had a cost basis of $100,000.  Respondent
disagrees with petitioner's position on both of these points.

---

[7] All amounts are rounded to the nearest whole dollar.  This
rounding accounts for the apparent discrepancies in the totals.

Petitioner's J Car Activity

If an activity is one "not engaged in for profit", section 183 limits the deductions allowed with respect to that activity. First, section 183(b)(1) allows the full amount of those deductions available without regard to the profit objective of the activity. Then, section 183(b)(2) allows those deductions normally permitted only if such activity were engaged in for profit, but limits them to the amount by which the gross income from that activity exceeds any deductions taken under section 183(b)(1). Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212.

Whether deductions are allowable under section 162 or section 212 depends upon whether the taxpayer engaged in that activity with the "actual and honest objective of making a profit." Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be a reasonable one; however, the taxpayer must have a bona fide objective to make a profit. Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980).

Whether a taxpayer has the requisite actual and honest objective of making a profit is a question of fact to be resolved on the basis of all of the facts and circumstances of the particular case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. at 720. The taxpayer bears the burden of proof on this issue. Rule 142(a). In resolving this factual issue, greater weight is accorded to objective facts than to a taxpayer's mere statement of intent. Thomas v. Commissioner, 84 T.C. 1244, 1269 (1985), affd. 792 F.2d 1256 (4th Cir. 1986); Dreicer v. Commissioner, 78 T.C. at 645; sec. 1.183-2(a), Income Tax Regs.

Section 1.183-2(b), Income Tax Regs., sets out a nonexclusive list of nine factors relevant to the issue as to whether the taxpayer has the requisite actual and honest profit objective.[8] Not all of these factors are applicable in every case, and no one factor is controlling. Taube v. Commissioner, 88 T.C. 464, 479-480 (1987); Abramson v. Commissioner, 86 T.C.

---

[8] These factors are: (1) Manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) expectation that assets used in activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.

360, 371 (1986); Allen v. Commissioner, 72 T.C. at 34; sec. 1.183-2(b), Income Tax Regs.  No one factor nor a majority of the factors is determinative, and we do not reach our decision by merely counting the factors that support each party's position. Taube v. Commissioner, supra at 480; Dunn v. Commissioner, 70 T.C. at 720.

Keeping in mind these factors, we review various aspects of petitioner's activity.  Petitioner had no design plans drawn or otherwise reproduced, no patent, no mold for the production of copies of the J car, and no records of the production expenses or of his marketing activities or expenses.  Other than his own extensive reading on the production of automobiles, petitioner had no background in the design and construction of an experimental automobile.  Petitioner consulted no experts on design, manufacturing, or marketing.  We cannot assume that the auto shop mechanics, experienced in automobile alignments, had expertise in the design and development of a car such as the one at issue.  The unique feature of the J car, its purported fuel efficiency of 116.7 miles per gallon, has never been certified or otherwise verified; the J car has been driven only 5 miles, from the auto shop to petitioner's home.

Petitioner's marketing activities were minimal at best.  He ran radio advertisements only where they could be obtained on a per-inquiry basis, a strangely miserly decision when he termed the expense of $3,500 for a body mold "not a big expense".  The

two or three radio stations running these advertisements were in California; petitioner and the J car were in Virginia. The magazines that supposedly printed petitioner's flyers were distributed in Europe. Petitioner provided no proof of these purported sales efforts or of his marketing to manufacturers, although the loss of his records occurred in 1985, not in 1989 and 1990 when he allegedly was spending 25 hours a week on his J car-related activities. We doubt that the minimal marketing activities that petitioner described consumed the 25 hours per week he claims.

The two inquiries that came to petitioner--the Texas man with a corporate shell who was searching for an operating business to put into his shell, and the individual with a patent on a new motor who was looking for a car in which to put his new motor and who had been dealing with a Brazilian company--seem to have been wholly fortuitous and without any effort on petitioner's part. Moreover, these were casual inquiries at best and were never reduced to writing.

Petitioner made no profit, indeed no income, from this activity. He was involved in no other similar activities. His primary occupation was a mortgage loan business and real estate investments. Petitioners' major sources of income during 1989 and 1990 were from the sale of real property and interest. While it is unlikely petitioner entered into the J car activity with a

tax avoidance motive, the claimed depreciation would provide a substantial offset to petitioners' other income.

Based on the record as a whole, we conclude that petitioner was not engaged in any trade or business in regard to the J car and was not engaged in any activity of selling the J car, or copies of it, for profit. Thus, his depreciation deductions are limited by section 183(b)(2) to zero, the amount of his gross income from that activity in each of the years at issue. Moreover, petitioner has not established a cost basis in the J car, even if the expense were otherwise deductible.

Cost Basis

The depreciation deduction is a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or an activity for profit. Sec. 167(a). The allowance is

> that amount which should be set aside for the taxable year * * * so that the aggregate of the amounts set aside, plus the salvage value, will, at the end of the estimated useful life of the depreciable property, equal the cost or other basis of the property * * *

Sec. 1.167(a)-1(a), Income Tax Regs. The basis to be used is "the adjusted basis provided in section 1011 for the purpose of determining gain on the sale or other disposition of such property." Sec. 167(g).[9] In the instant case, petitioner's

---

[9] This is the section in effect for property placed into service during 1989. The section was later renumbered sec. 167(c) by sec. 11812(a)(1)and (2)of the Omnibus Budget Reconciliation Act of 1990, Pub. L. 101-508, 104 Stat. 1388, 1388-534, for property placed into service after Nov. 5, 1990.

basis is the cost of constructing the J car.  Secs. 1011, 1012, 1016.

Petitioner alleges that he spent $100,000 to build the J car.  Respondent argues that petitioner has not substantiated his basis in the J car and, therefore, cannot take the claimed depreciation deduction.

Petitioner has no records of the expenses he incurred in building the car.  At trial, he attempted to estimate those expenses by producing the auto shop's check stubs.  Stubs were missing for some of the period that petitioner owned the auto shop.  None of the checkbook deposit entries was marked as to its source.  Petitioner offered no other financial records of the auto shop, such as customer invoices or receipts, or account statements, to correlate with these deposit notations.  Although petitioner says he used 20 to 30 credit cards to reimburse the auto shop, petitioner offered no credit card receipts or statements.  He did not establish that the auto shop had paid the expenses initially.[10]  Nor did he offer any proof of the loans he says he obtained to finance his project.

Petitioner testified that he paid for the J car by what he called "credit card loans" and other loans.  He testified he used

_____

[10]  A small number of the checks could have been payments for auto parts, based on the notation on the stubs, where present, or by the name of the payee.  However, even those stubs with notations do not specify that the parts were for petitioner's J car.

his and his wife's many credit cards to make purported charges at the auto shop.  If so, the auto shop would then have been paid by the credit card company for the charges, less of course the usual discounts or fees charged by a credit card company to the merchant (i.e., the auto shop); petitioners however would still be liable to the credit card company for the full amount of the purported charges.  Assuming these "credit card loans" generated funds (through float, delays in payments, failure to pay the credit card company, etc.), there is nothing in the record to show that the deposits to the auto shop bank account came from any such "credit card loans".  Without some tracing of funds through the auto shop records, without some evidence that the auto shop paid the expenses of the J car and did not deduct such expenses either on petitioner's Schedule C's when the business was operated as a sole proprietorship or on the corporation's tax returns once the business was incorporated, there are simply too many uncertainties for the Court to accept petitioner's self-serving, generalized, and unsupported testimony.

The Court is satisfied that some expenses were incurred over the years in designing and building the J car.  The Court is not satisfied that petitioner personally bore these expenses or has any basis in the J car.  The auto shop checkbook deposits cannot with any reasonable certainty be tied to any costs that petitioner incurred.  As we have stated previously,

> While it is within the purview of this Court to estimate the amount of allowable deductions where there is evidence that deductible expenses were incurred (Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930)), we must have some basis on which an estimate may be made. Williams v. United States, 245 F.2d 559 (5th Cir. 1957). * * *

Vanicek v. Commissioner, 85 T.C. 731, 742-743 (1985). Since the record contains no evidence from which the Court could make such an estimate, we must find that petitioner failed to substantiate the cost basis of the J car.[11]

Accordingly, we conclude that petitioner's deductions for depreciation related to the J car must be disallowed.

To reflect the concessions and above holdings,

Decision will be entered

under Rule 155.

---

[11] Thus, we need not address respondent's argument that it is not possible to attribute a 3-year or other specific period of useful life to the car.