T.C. Memo. 2000-182

UNITED STATES TAX COURT

TOMMY W. AND PAMELA L. BUSBEE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 2968-98.                    Filed June 14, 2000.

<u>William R. Cousins III</u>, for petitioners.

<u>Alvin A. Ohm</u>, for respondent.

MEMORANDUM OPINION

GOLDBERG, <u>Special Trial Judge</u>:  Respondent determined
deficiencies in petitioners' 1993, 1994, and 1995 Federal income
taxes of $4,736, $5,999, and $4,263, respectively.  Unless
otherwise indicated, section references are to the Internal
Revenue Code in effect for the years in issue.

Some of the facts have been stipulated and are so found.
The stipulation of facts and the attached exhibits are

incorporated herein by this reference.  At the time that the petition was filed, petitioners resided in Midland, Texas. Petitioners are husband and wife.  References to petitioner are to Tommy W. Busbee.

The issue to be decided is whether petitioners' fishing activity constituted an activity engaged in for profit pursuant to section 183 for the taxable years in issue.

During the years in issue, petitioner was employed full time as a safety representative for Parker and Parsley.  Petitioner wife was also employed full time and worked as a receiving and shipping clerk for Sam's Club.

In the late 1980's, petitioners began investigating several bass fishing tournament organizations in order to see whether hosting bass fishing tournaments was an activity in which they could earn income for their eventual retirement.[1]

In the course of their inquiry, petitioners spoke with Tommy Taylor (Mr. Taylor), the president of the Couples Association of Sport Tournaments (CAST).  CAST, a sole proprietorship operated by Mr. Taylor, organized and hosted bass fishing tournaments

---

[1] Petitioners first began bass fishing around 1978, and petitioner has been a member of several recreational bass fishing organizations over the past several years.  He has also served as the vice president of the High Sky Bass Club and as a board member of the Permian Basin Black Bass Invitational and of Texas Black Bass Unlimited.

since 1984 and is the oldest and largest couples bass fishing circuit in Texas.

CAST is organized into several regions, each with a regional director. Each CAST region hosts its own bass fishing tournaments during the summer. The CAST tournament season culminates in the Classic Tournament, in which certain members of the various CAST regions compete against each other.[2]

Petitioners decided to become involved with CAST in 1991 because it was an established bass fishing tournament organization with a good reputation. Further, petitioners believed that CAST's reputation would more easily attract members, and therefore generate more income than other tournament organizations. Shortly after joining CAST, petitioner was made the director of the newly created western region, which included Midland, Texas.

As a director, petitioner is responsible for organizing and hosting regional fishing tournaments and his responsibilities include securing local permits, contacting local chambers of commerce, and arranging for local tournament lodging. Petitioner's duties as a director also include recruiting local CAST members.

---

[2] The Classic is the final tournament of the year and is open to CAST members from all regions who have earned a minimum number of points.

CAST directors do not have a contractual agreement with Mr. Taylor, but they are permitted to use the CAST name in operating their respective regions. Directors generate income by collecting membership fees and by hosting regional tournaments and are responsible for all expenses incurred in their activities.

Since the western region was new and did not have any members, petitioners recruited new members in their spare time. Petitioners printed up fliers and business cards and distributed them on weekends and evenings during fishing-related events.[3] Petitioners also recruited new CAST members by renting booths at local boat shows, posting CAST fliers at marinas, and speaking to bass fishing clubs.

CAST also helped directors with regional recruitment by advertising in and contributing articles to Texas bass fishing magazines such as Honey Hole and Our Inland Fisheries. The advertisements and articles promoted upcoming CAST tournaments and publicized the names of companies sponsoring the tournaments. In addition, CAST created and maintained its own website as a way of advertising both its tournaments and corporate sponsors on the Internet.

---

[3] Petitioners distributed about 400 to 500 business cards annually. The business cards also listed the dates and places of CAST tournaments on the back.

Over time, petitioners successfully recruited new members for the western region and began to organize and host several regional tournaments. During the taxable years in issue, petitioners hosted six annual tournaments with about 30 to 40 couples participating in each tournament.

Petitioner wife also contributed to the fishing activity by helping her husband recruit members and promote and organize tournaments, and by maintaining monthly financial and membership records. Petitioners' fishing activity financial records included detailed information on monthly activity expenses, including lodging and meal expenses. Petitioner wife also maintained a separate checking account for the fishing activity, kept lists of western regional membership, and sent out a tournament newsletter to members and sponsors in an effort to retain participating members. Petitioners' efforts to retain and recruit members are very important to the conduct of the fishing activity because of the fee structure of CAST.

Petitioners charge an annual couple membership fee in the amount of $35, of which they keep $3 and forward the remaining $32 to Mr. Taylor. In addition, petitioners also charge a fee in the amount of $55 per tournament to member couples who fish in regional tournaments.[4] Petitioners keep $8 of the tournament fee and forward $11 to Mr. Taylor: $2 as a "cast fee" and $9 to be

---

[4] Tournament fees were later raised to $75 per couple.

added to the prize for the annual Classic Tournament.[5] Petitioners award the remaining $36 as tournament prizes in the regional tournament in which it is collected: $5 of that amount is awarded to the couple catching the largest bass, and $31 is allocated to a fund for general tournament prizes. Petitioner wife prepares an expense report for Mr. Taylor at the end of each tournament.

During the years in issue, petitioners routinely awarded regional tournament prizes of approximately $300 to $400. CAST, itself, awarded an annual prize of approximately $14,000 during the yearend Classic Tournament.[6]

During the time petitioner has worked as western region director, CAST has grown from three to eight regions with more than 400 member couples, of whom 38 couples are members of petitioner's western region.

In addition, CAST tournaments have also begun to attract several nationally recognized corporate sponsors, including Ranger Boats, Mercury Marine, Continental Batteries, Santone Lure Company, and Terminator lures. In 1995, Ranger Boats, one of CAST's corporate sponsors, began providing CAST with fishing

---

[5] Member couples also pay $135 to compete in the annual Classic Tournament.

[6] The top prize is usually based on a percentage of all tournament fees collected by CAST. In 1995, however, the top prize was a Ranger fishing boat and trailer provided by Ranger Boats and valued at approximately $35,000.

boats and trailers.[7]  Pursuant to the agreement, CAST uses a
specified number of new Ranger boats for 1 year and then trades
the boats for newer models.[8]

Various local businesses near tournament sites are also
beginning to sponsor CAST tournaments by providing free services
for directors, such as meals and lodging, as a way of attracting
future business from CAST.  Various municipalities have also paid
subsidies to CAST in order to attract the annual Classic
Tournament to their community.

CAST has also expanded its activities beyond merely holding
regional tournaments and was scheduled to participate as one of
the qualifying circuits[9] for the Millennium Invitational
Tournament (Millennium Tournament) in November 1999.  The top
prize in the Millennium Tournament, sponsored by Ranger Boats, is
valued at $1 million.

In 1996, Mr. Taylor made petitioner a Supervising Director
of CAST.  As CAST's only Supervising Director, petitioner is
entitled to receive part of the fees collected by the regional

---

[7]     By 1997, Ranger Boats provided CAST with five boats and
trailers.  The boats are valued between $32,000 and $39,000 each.

[8]     CAST agreed to pay freight costs and keep the boats
individually insured.  CAST negotiated reduced insurance rates on
the boats as part of a sponsorship agreement with Bait Insurance.

[9]     CAST is one of only two qualifying circuits for the
Millennium Tournament in Texas.

directors he supervises in the amount of $4 per member couple per event.[10]

Petitioners have also expanded the income potential of their fishing activity by constructing a "weigh station" at Lake O.H. Ivie. Petitioners use the weigh station, a stage constructed on a flatbed trailer, as a place for tournament participants to display fish, receive fishing awards, and have their pictures taken. Petitioners earn income from the weigh station by selling advertising space to local businesses and by using the weigh station to recruit additional CAST members.

Petitioners reported the following Schedule C net losses and profits resulting from their involvement in CAST for the taxable years 1993 through 1998:

|  | 1993 | 1994 | 1995 | 1996 | 1997 | 1998 |
|---|---|---|---|---|---|---|
| Gross income | $5,065 | $19,788 | $23,679 | $30,559 | $26,474 | $17,103 |
| Total expenses | 22,148 | 41,391 | 37,525 | 28,822 | 22,243 | 15,452 |
| Net profit or (loss) | (17,083) | (21,603) | (13,846) | 1,737 | 4,231 | 1,651 |

Petitioners also claimed Schedule C net loss deductions for the 1991 and 1992 taxable years of $10,943 and $16,466, respectively.

In a notice of deficiency for the 1993, 1994, and 1995 taxable years, respondent determined that petitioners did not engage in their fishing activity with an actual and honest

---

[10]   At the time of trial, petitioner supervised three newly organized regions of CAST, while also acting as director of the western region.

objective of making a profit and that the expenses incurred in connection with the fishing activity were therefore deductible only up to the amount of income earned from that activity.

As a result of respondent's determination, petitioners were allowed the standard deduction for 1993, which was larger than the allowable activity limitation for that year, and were allowed deductions of $19,788 and $23,679 for the 1994 and 1995 taxable years, respectively.

Section 162(a) allows a taxpayer to deduct "all the ordinary and necessary expenses paid or incurred * * * in carrying on any trade or business".  No deduction is allowed for family, living, or personal expenses.  See sec. 262(a).

If an individual engages in an activity without the objective of making a profit, section 183 generally limits allowable deductions attributable to the activity to the extent of gross income generated by such activity.  See sec. 183(b).

For a taxpayer to be engaged in a trade or business, the taxpayer's primary purpose for engaging in the activity must be for income or profit, and he must be involved in the activity with continuity and regularity.  See Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Whether or not a taxpayer is engaged in the activity for profit depends on all the surrounding facts and circumstances of the case.  See Golanty v. Commissioner, 72 T.C. 411, 426 (1979),

affd. without published opinion 647 F.2d 170 (9th Cir. 1981).

Greater weight is given to objective facts than to a taxpayer's mere statement of intent. See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

The regulations provide a list of relevant factors to consider in determining whether an activity is engaged in for profit. Those factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. See sec. 1.183-2(b), Income Tax Regs.

No one factor is conclusive. We do not reach a decision by merely counting factors supporting each party's position. See Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980).

Respondent does not contest that the claimed deductions were incurred with respect to petitioners' fishing activity, but

asserts that petitioners did not engage in the fishing activity with an intent to make a profit. We disagree.

Petitioners widely advertised their fishing activity and engaged in numerous promotional activities in the expectation of recruiting additional CAST members and thereby making a profit. Petitioners also devoted substantial amounts of time to their fishing activity in spite of their full-time employment elsewhere. Petitioners' fishing activity is, in effect, a noncontractual franchise in which directors are allowed to use the CAST name in their respective regions and are able to keep part of the gross receipts from the activity while accepting responsibility for all of the attendant incurred expenses.

Petitioners kept detailed business records and mailing lists and constantly strove to increase the profitability of their fishing activity. If one fishing activity practice increased operating expenses, petitioners sought out ways to change that aspect of the activity in an effort to reduce expenses and make the activity more profitable. For example, petitioners were able to reduce operating costs by soliciting local sponsors for lodging and meals and by arranging for Ranger Boats to pay petitioners' boat show booth fees in exchange for publicity.

Once petitioners decided to conduct this activity to earn income for their retirement, they sought out the expertise of Mr. Taylor, a person who had organized over 300 fishing tournaments.

After they joined CAST, petitioners continued to consult with Mr. Taylor about five times a week.

Petitioners also continued to study and perfect new techniques to improve the quality and profitability of their fishing activity. In time, petitioners, themselves, became experts who were relied upon by other CAST directors. Petitioner is now a Supervising Director with three regions reporting to him and his gross receipts from the fishing activity will continue to grow as more regions are created.

Though there is no question that petitioners derive pleasure from their fishing activity, and petitioners concede that they fish in their own tournaments on occasion, petitioners' passion for fishing does not disqualify them from having a profit objective. The process of organizing and hosting a fishing tournament is physically difficult and requires long hours of work, and, in this case, far outweighs whatever personal pleasure petitioners derive from occasional participation in their own tournaments.

Although petitioners sustained losses during the first 5 years of their fishing activity, this alone does not necessarily indicate that the activity was not engaged in for profit. See Churchman v. Commissioner, 68 T.C. 696 (1977).

In Zwicky v. Commissioner, T.C. Memo. 1984-471, the taxpayers operated a charter fishing boat service and sustained

losses for the first 5 years they operated the charter service, yet we held that the deduction of those losses was not barred by section 183 because the facts of the case indicated that the taxpayers had an intent to make a profit. The facts of this case likewise indicate that petitioners had an intent to make a profit.

We also note that although petitioners in this case sustained losses in the first 5 years of their operation, they reported a gross profit for the 1996, 1997, and 1998 taxable years.

At trial, respondent argued that petitioners intentionally altered the reporting of their Schedule C income and expenses for the 1996, 1997, and 1998, taxable years in order to artificially create the appearance of profit through the exclusion of deductible expenses and the inclusion of unrelated income. We do not agree.

Though petitioners' income has fluctuated due to membership changes and the general fortunes of the bass fishing industry, the record establishes that petitioners' expenses declined in 1996, 1997, and 1998, due to contributions from sponsors, a decrease in travel costs, and reduced expenses. In addition, petitioners' income rose in 1996 as a result of petitioner's promotion to Supervising Director and from income earned by petitioners from the weigh station at Lake O.H. Ivie.

Upon the basis of the record, we find that the totality of the facts and circumstances indicates that petitioners' fishing activity was an activity engaged in for profit pursuant to section 183. Therefore, petitioners' losses attributable to their fishing activity are not subject to the limitations of section 183.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioners</u>.