T.C. Summary Opinion 2002-26


UNITED STATES TAX COURT


J. MICHAEL AND SUSAN L. REIMER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 10638-99S.                    Filed March 28, 2002.

John J. Morrison, for petitioners.

Jennifer L. Nuding, for respondent.


GOLDBERG, Special Trial Judge: This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed. The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority. Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined the following deficiencies, additions to tax, and penalties with respect to petitioners' Federal income taxes:

| Year | Deficiency | Addition to Tax Section 6651(a) | Penalty Section 6662(a) |
|------|-----------|----------------------------------|--------------------------|
| 1993 | $3,937 | $237 | $787 |
| 1994 | 6,917 | 287 | 1,383 |
| 1995 | 6,330 | 568 | 1,266 |

After concessions by respondent,[1] the issues for decision are: (1) Whether petitioners' horse breeding operation was an activity engaged in for profit within the meaning of section 183(a); (2) whether petitioners' water and air filtration operation was an activity engaged in for profit within the meaning of section 183(a); (3) whether petitioners are liable for additions to tax for failure to timely file returns under section 6651(a) for the taxable years 1994 and 1995; and (4) whether petitioners are liable for accuracy-related penalties pursuant to section 6662(a) for the years in issue.

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time the petition was filed, petitioners resided in Montgomery, Illinois.

---

[1] Respondent concedes that there is no addition to tax under sec. 6651(a) due from petitioners for 1993. Respondent further concedes $252 of the sec. 6651(a) addition to tax for 1995 due to respondent's failure to credit petitioners with $5,035 of withheld income taxes.

A.    Petitioners' Background

Petitioners are husband and wife.  Susan L. Reimer (Mrs. Reimer) has had a lifelong passion for horses.  Her parents have owned horses since her early childhood, and she had a pony at the age of 3.  During high school, Mrs. Reimer entered her first horse show competition through participation in a 4-H program.  Mrs. Reimer has continued to ride horses on her own since her early adulthood.  At the time of petitioners' marriage, approximately 32 years ago, Mrs. Reimer owned her own horse.  Mrs. Reimer was a preschool teacher during the years in issue.

J. Michael Reimer (Mr. Reimer) holds a bachelor's degree in business administration.  He also completed some postgraduate courses, although he does not hold a graduate degree.  During college, he completed approximately 16 hours of accounting courses.  In 1989, Mr. Reimer began working for Recticel Foam Corporation as vice president of sales and marketing.  When the corporation was bought in 1990, his position was terminated.  Mr. Reimer, while seeking new employment, learned of a company called National Safety Associates (NSA), which privately marketed air and water filters.  This activity will be described in detail below.  In order to earn more income, Mr. Reimer looked for full-time employment.  In the fall of 1991, Mr. Reimer was hired as an automobile salesman for Borg Pontiac.  He worked for Borg Pontiac until September 1993 when he again changed employment to Village

Pontiac. At Village Pontiac Mr. Reimer started as a salesperson, but quickly advanced to finance manager.

B. NSA Air and Water Filtration Activity

As stated above, in 1990 Mr. Reimer became involved with NSA after he lost his job with Recticel Foam Corporation. Mr. Reimer attended a local NSA seminar that he became aware of through a newspaper advertisement. NSA marketed air and water filtration devices, and later educational goods, through a direct marketing distributorship similar to the Amway business model. At first, Mr. Reimer was a distributor for NSA but rose to the next level of sales coordinator. As a sales coordinator, Mr. Reimer had other distributors below him. Mr. Reimer conducted local seminars to sell products and recruit new sales coordinators, and also attended regional and national conferences.

Mr. Reimer recorded all NSA related business income and expenses in an outdated computer system which used 5-1/4-inch floppy disks. Petitioners upgraded their computers in 1995 and as a result Mr. Reimer no longer has access to his business records pertaining to NSA on the floppy disks. Mr. Reimer reported income and business expenses from the NSA activity on Schedule C, Profit or Loss From Business. Beginning in late 1991, Mr. Reimer decided that he would seek new full-time employment because he wanted to earn more money but would continue the NSA activity on a part-time basis. He obtained

full-time employment with Borg Pontiac, an automobile dealer, and then at Village Pontiac, another automobile dealer. In 1993, Mr. Reimer testified that he made a conscious decision to end his involvement with NSA. Mr. Reimer terminated the NSA activity either in 1993 or early in 1994, at the latest, by writing a letter of termination and returning all remaining inventory to NSA.

Mr. Reimer's NSA activity was reported on Schedules C for the tax years 1991 through 1994, as a secondary activity separate from petitioners' horse breeding activity.

C.   Horse Breeding Activity

Petitioners' horse breeding operation first began around 1976. This activity was originally named J-Mar Arabians. Petitioners changed the name to Summer's End Farm upon their move from Ohio to Oswego, Illinois, in 1989.

In 1971, petitioners purchased their first purebred Arabian foal, J-Mar Elbravado. They thought J-Mar Elbravado would become a stallion and could be bred. About 3 years after the purchase of J-Mar Elbravado, petitioners learned that the stallion had a cryptorchidism (recessed testicle) which rendered him useless for breeding. Petitioners had J-Mar Elbravado gelded in 1974, but they still continued to show him in Arabian horse shows. He was sold in either 1977 or 1978 for an undisclosed amount.

Petitioners decided to change the direction of their operation by going into mare breeding.  In 1976, the year that petitioners began their breeding activity and completed a Schedule F, Profit or Loss From Farming, for their horse breeding endeavor, they purchased a second Arabian horse, Emkay Asmara (Asmara), a yearling filly.  This horse was petitioners' first breeding mare.  Asmara was bred first with Amerigo and a foal was born in 1977, which died several hours later.  Asmara was then bred to Bak, owned by Paramont Arabians (Paramont).  Paramont became interested in Asmara, and, as a result, petitioners worked out a trade arrangement, whereby Paramont would keep Asmara in foal and petitioners would obtain a higher quality filly than Asmara.  When petitioners had the veterinarian examine the Paramont filly on their premises, it was determined that the filly had a major breeding fault.  The filly was returned and petitioners received back Asmara in foal.  The foal was born in 1978 but only lived for 10 days.  Petitioners brought Asmara back to Paramont for breeding.

Paramont was interested in Asmara because they had a potential buyer for her.  Petitioners sold Asmara to Paramont and acquired Ms. Bak in 1979, a mare born in 1976.  On September 1, 1981, petitioners entered into a mare lease agreement with Keg Arabian.  The Keg Arabian stallion named Pattrone was bred to Ms. Bak for the purpose of obtaining a marketable foal.  The first

foal born in 1983 was Parable. Keg Arabian exercised the option under the lease agreement to keep the filly and petitioners had an option on the next foal. Ms. Bak was bred to Pattrone again. In 1984 a filly was born, and she was named Tender Moment. Petitioners exercised their option and kept Tender Moment. A third foal was born in May 1986 from breeding Ms. Bak to Pattrone. This filly was named Autumn Eve. Petitioners sold Autumn Eve in 1987 for $7,500.

On January 1, 1987, petitioners entered into a horse breeding agreement with Grenier Training Center, whereby they bred Ms. Bak to their stallion, Azare. A foal was born but was killed when hit by an automobile. Petitioners were not able to successfully breed Tender Moment.

On March 7, 1988, petitioners entered into a horse breeding agreement with Robert and Elizabeth Pasquesi to breed Ms. Bak with their stallion named Kamin. The record is not clear whether any foal was born.

In the meanwhile, sometime in 1981, petitioners purchased a mare named Sassafras Street (Sassafras) for $5,700. In 1985, Sassafras was bred with Pattrone, and in 1986 a foal was born named J.W. Venture. In 1988, Sassafras was bred with Kamin, and in 1989 a foal named Kamin's Dark Star was born. In 1989, Sassafras was bred with Kamin, and in 1990 a foal, Jessica's Melody, was born.

J.W. Venture was sold in 1986 and subsequently gelded in 1997. Jessica's Melody was sold in 1994 for $2,500.

Petitioners, on December 15, 1994, entered into a lease agreement with Jim and Jackie Gully to breed Ms. Bak and Sassafras with two stallions of Mr. and Mrs. Gully's choice. No foals were born.

In 1993 petitioners' "herd" consisted of four mares: Ms. Bak, Sassafras, Tender Moment, and Jessica's Melody. The ages of these mares were 16, 13, 9, and 3 years, respectively. Jessica's Melody was sold in 1994 for $2,500. By the end of 1994, petitioners only had three mares.

D.   Petitioners' Business Plans

In petitioners' first business plan entitled "J-Mar Arabians Est. 1971" (1971 business plan), petitioners stated their objective as "long term profit 'optimization' through careful, practical, well-planned program of investment in a quality stock for breeding and sale, and to breed the perfect Arabian horse - athletic elegance."

Attached to their 1971 business plan was a 5-year plan financial spreadsheet and summary for the period 1971 to 1976. According to this plan, petitioners would yield an annual positive cashflow starting in 1975, or year 5; however, petitioners' plan stated an overall net loss through 1976 of $8,500. In 1976, the plan projected total assets worth $11,000.

Petitioners' second plan, entitled "J-Mar Arabians 5 Year Plan - Revised: 1975-1980" (revised 5-year plan), carried forward the overall net loss of $8,500 from the 1971 business plan, and continued to make projections through 1980. At the end of 1980, petitioners projected assets worth $19,450 and an overall net loss of $18,650.

Petitioners' third business plan, entitled "J-Mar Arabians 5 Year Plan - Revision II: 1980-1985" (second revised 5-year plan), also carried forward the projected net loss of $18,650 in 1980 (from the revised 5-year plan) as the starting point for the 1980 to 1989[2] projections. According to the second revised 5-year plan, petitioners would yield an overall net profit of $23,850 in 1988, or year 18.

In 1985, petitioners drafted a proposed limited partnership agreement for the purchase of a one-third interest in Sassafras and Tender Moment by a third party. Included in the proposal are the following documents: An estimated 5-year cashflow, estimated fair market value of the horses (Sassafras valued at $200,000 and Tender Moment valued at $300,000), payment terms, and cash reconciliation with depreciation. This partnership was never formed.

---

[2] Petitioners' financial projections were for the time period 1980 through 1989, even though their business plan was for the period 1980 through 1985.

Petitioners' next business plan is entitled "Summer' [sic] End Farm 10 Year Plan Financials" (1990 business plan). The 1990 business plan did not carry over the prior period's "net cumulative" amount, thus starting from scratch. Based upon the 1990 business plan, petitioners projected a net profit in 1992.

Petitioners testified that the business plans were written within a year or two from the beginning of the time period covered in each plan. Petitioners did not conduct an income or expense summary based on actual amounts incurred or expended for any given time period. Petitioners stipulated that they did not revise any of the above business plans or financial projections after the plans were written.

Each plan also included an attached narrative summary of what occurred in the prior period.

Petitioners printed business cards and brochures to promote the horse breeding activity. Petitioners also maintained a separate checking account for the horse breeding activity.

Petitioners were members of various Arabian horse associations during the years in issue, including the International Arabian Horse Association (IAHA) and American Horse Shows Association.

E. Petitioners' Time and Effort

Petitioners divided the work responsibilities for their horses. Mrs. Reimer handled most of the labor and the horses'

physical needs, e.g., taking the horses out to pasture, grooming, feeding, and cleaning out stalls daily, while Mr. Reimer handled all of the administrative duties, e.g., maintaining farm records, paying bills, and preparing all tax returns.

During the years in issue, both petitioners worked full-time outside of their horse breeding activity. Mrs. Reimer worked with the horses before and after returning from teaching preschool on weekdays. In a typical week, Mrs. Reimer spent 2 to 4 hours a day maintaining the horses, e.g., cleaning out the stalls, feeding, grooming, and exercising the horses. During weekends, Mrs. Reimer would complete all of the barn chores, spending from 3 to 6 hours on Saturday and Sunday. Mrs. Reimer testified that she tracked each horse's "heat cycle" on a calendar for breeding purposes; however, the calendar was not provided at trial.

Mrs. Reimer is primarily responsible for training, grooming, and preparing the horses for show. She rode the horses every day as part of their exercise and condition training for shows. Mr. Reimer assisted, on occasion, in preparing the horses for show, which included warming up or riding the horses, although Mrs. Reimer exclusively rode the horses during a show. Mr. Reimer typically assisted Mrs. Reimer about 1 hour per day in the more labor intensive aspect of horse breeding in addition to the approximately 10 hours per week of administrative duties.

Although petitioners have four children, the children have no interest in the horses and do not ride them.

F.    Arabian Horse Shows

Petitioners regularly showed their horses in IAHA sanctioned shows and non-IAHA shows.  Only horses that showed and placed in IAHA sanctioned shows received points toward various rankings. Ms. Bak was awarded the Supreme Legion of Merit in 1985,[3] Tender Moment was awarded the Legion for Supreme Honor, and Sassafras was awarded the Legion of Merit in 1997.

Their horses were trained primarily by Mrs. Reimer, as she does not trust her horses to most trainers,[4] and have accumulated an impressive record.  During 1994, Tender Moment placed in 12 separate Arabian horse shows, Sassafras placed in 4 separate Arabian horse shows, and Jessica's Melody placed in 1 Arabian horse show.  The "herd" was not shown often in 1993.

Through participation in the horse shows Mrs. Reimer was able to associate with the "inner circle of trainers" who worked for wealthy horse owners.  At horse shows, Mrs. Reimer intentionally warmed up her horses at the same time as trainers with more "political power" and knew many of them on a first name basis.

---

[3]    Ms. Bak was the 110th Arabian horse to reach the level of Supreme Legion of Merit.

[4]    However, Mrs. Reimer hired a professional trainer during 1995 to train Tender Moment.

G.   Appreciation of Property

The assets of petitioners' horse breeding activity consist of the horses.  Ms. Bak was purchased in 1979 for $15,000.  In 1981, Ms. Bak was insured for $40,000.  In petitioners' proposed 1985 partnership offering, drafted by petitioners, Sassafras and Tender Moment were valued at $200,000 and $300,000, respectively. At trial, Mr. Reimer estimated the collective value of Ms. Bak, Tender Moment, and Sassafras in 1993 to range between $30,000 and $50,000.  No expert testimony was given at trial to support Mr. Reimer's valuations, the insurance record valuation, or the 1985 partnership offering valuation.  Furthermore, no estimated value was given for Jessica's Melody which was sold in 1994 for $2,500.

H.   Petitioners' Advisers

Petitioners consulted an accountant in 1976 "when we set up the business".  Petitioners showed the accountant their books and records and were purportedly told by the accountant that they could handle the record keeping themselves, and that "it would be a waste of money" to hire the accountant.  According to Mr. Reimer they did not discuss what amounts were deductible because Mr. Reimer "knew I could" take the deductions.  Mr. Reimer read the regulations and the Internal Revenue Code and filed their returns based upon his research.  At times Mr. Reimer consulted with the Internal Revenue Service (IRS).  Prior to the audit of this case, petitioners were never audited by the IRS.

I. Petitioners' Income And Expenses

Petitioners do not recall whether their horse breeding activity ever resulted in any net income. The following is a summary of petitioners' gross receipts, expenses, and net losses from their NSA activity and horse breeding activity, as reported on petitioners' Schedules F for the years 1992-1998:

| Year | NSA Activity | | Horse Activity | | Combined Operations | | |
|------|------|------|------|------|------|------|------|
| | Gross Receipts | Expenses | Gross Receipts | Expenses | Gross Receipts | Expenses | Net Gain (Loss) |
| 1992 | $406 | [1]$202 | [2]$240 | $37,813 | $646 | $38,015 | ($37,369) |
| 1993 | 0 | [3]1,072 | [2]80 | 22,665 | 80 | 23,737 | (23,657) |
| 1994 | 4,465 | [4]1,365 | [5]4,430 | 38,738 | 8,895 | 40,103 | (31,208) |
| 1995 | N/A | N/A | 0 | 25,162 | 0 | 25,162 | (25,162) |
| 1996 | N/A | N/A | [6]28,292 | 30,903 | 28,292 | 30,903 | (2,611) |
| 1997 | N/A | N/A | [7]20,303 | 25,223 | 20,303 | 25,223 | (4,920) |
| 1998 | N/A | N/A | [8]32,130 | 36,852 | 32,130 | 36,852 | (4,722) |
| Total | $4,871 | $2,639 | $85,475 | $217,356 | $90,346 | $219,995 | ($129,649) |

[1]     Petitioners also claimed cost of goods sold of $1,774.
[2]     This amount represents "other income, including Federal and State gasoline or fuel tax credit or refund."
[3]     Petitioners also claimed cost of goods sold of $920.
[4]     Petitioners also claimed cost of goods sold of $4,931.
[5]     $1,930 of this amount is from "other income".
[6]     This amount represents sale of livestock of $12,700, custom hire income of $11,082, and "other income" of $4,510.
[7]     This amount represents sale of livestock of $3,000, custom hire income of $13,593, and "other income" of $3,710.
[8]     This amount represents sale of livestock of $15,200 and custom hire income of $16,930.

Horse breeding activity income received during years 1996 through 1998 includes sale of livestock, custom hire income, and other income, including Federal and State gasoline or fuel tax credits or refunds.

The following is a table of petitioners' W-2 income, and Federal income taxes withheld for 1992-1998:

| Year | W-2 Income | Federal Income Taxes Withheld |
|------|-----------|-------------------------------|
| 1992 | $70,015 | $98.96 |
| 1993 | 70,621 | 48.63 |
| 1994 | 84,555 | 2,702.03 |
| 1995 | 94,697 | 5,034.71 |
| 1996 | 92,865 | 5,920.28 |
| 1997 | 70,054 | 3,502.74 |
| 1998 | 87,380 | 4,369.16 |
| Total | $570,187 | $21,676.51 |

In 1993, Mr. Reimer claimed 26 exemptions on Form W-4, Employee's Withholding Allowance Certificate. In 1995, Mr. Reimer also requested his employer, Village Pontiac, to apply a flat 10-percent Federal and flat 2-percent Illinois income tax rate for payroll purposes. In 1996, Mr. Reimer requested his employer, Village Pontiac, to apply a flat 5-percent Federal and flat 1-percent Illinois income tax rate for payroll purposes.

J.   Petitioners' Federal Income Tax Returns and Notice of Deficiency

Petitioners timely filed their 1993 Federal income tax return. Petitioners filed and were granted automatic extensions of time to file their 1994 and 1995 Federal income tax returns. Their 1994 and 1995 returns were received by respondent on August 21, 1995, and August 23, 1996, respectively. The postmark on the envelope containing the 1994 return was stamped August 15, 1995.

The record does not contain a copy of the envelope in which petitioners mailed their 1995 return.

On petitioners' Federal income tax returns for 1993, 1994, and 1995, petitioners deducted Schedule F expenses of $22,665, $38,738, and $25,162, respectively. Petitioners also deducted Schedule C expenses of $1,072 and $1,365 for tax years 1993 and 1994, respectively.

In a notice of deficiency for the 1993, 1994, and 1995 taxable years, respondent determined that petitioners did not engage in their horse breeding activity or their NSA water and air filtration activity with an actual and honest objective of making a profit, and that the expenses incurred in connection with each respective activity were therefore deductible only to the extent of income earned from that activity. Respondent further determined that petitioners are liable for accuracy-related penalties for all years in issue, and additions to tax for failure to timely file their 1994 and 1995 returns.

K.   Discussion

Section 162 allows deductions for ordinary and necessary expenses paid or incurred in carrying on a trade or business. To be engaged in a trade or business, "the taxpayer must be involved in the activity with continuity and regularity and * * * the taxpayer's primary purpose for engaging in the activity must be for income or profit." Commissioner v. Groetzinger, 480 U.S. 23,

35 (1987). If an individual engages in an activity without the objective for profit, section 183 generally limits allowable deductions attributable to the activity to the extent of gross income generated by such activity. Sec. 183(b).

Although "it is sufficient if the taxpayer has a bona fide expectation of realizing a profit, regardless of the reasonableness of such expectation", whether or not a taxpayer is engaged in the activity for profit depends on all the surrounding facts and circumstances of the case. Golanty v. Commissioner, 72 T.C. 411, 425-26 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Greater weight is given to objective facts than to a taxpayer's mere statement of intent. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983).

The regulations set forth the following nonexclusive factors to consider in determining whether an activity is engaged in for profit. These factors are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if

any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.

No one factor is conclusive.  Keanini v. Commsisioner, 94 T.C. 41, 47 (1990).  We do not reach a decision by merely counting factors supporting each party's position.  Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980).  Petitioners bear the burden of proving that they possessed the required profit objective.[5]  Rule 142(a); Golanty v. Commissioner, supra at 426; Smith v. Commissioner, T.C. Memo. 1997-503, affd. without published opinion 182 F.3d 927 (9th Cir. 1999).

Respondent does not contest that the claimed deductions were incurred with respect to petitioners' horse breeding activity and NSA activity but argues that petitioners did not engage in either activity during the years in issue with an intent to make a profit.  We agree.  Because the parties argued their respective cases by addressing each of the nine criteria enumerated in the regulations, we follow the same approach in our discussion.

(1)  Manner in Which The Taxpayer Carries on The Activity.

In this respect relevant factors include whether petitioners maintained complete and accurate books and records, and whether

---

[5]  We note that sec. 7491 is inapplicable in this case because petitioners' examination commenced prior to July 22, 1998.

changes were attempted in order to improve profitability.  Sec. 1.183-2(b)(1), Income Tax Regs.

Petitioners maintained a record of the income and expenses related to their horse breeding activity, but they did not provide evidence of a breakdown or break-even analysis of their overall horse breeding activity.  Although petitioners created a business plan for their horse breeding activity, it appears that they did not make decisions in accordance with the business plans, projections, or analyses of the costs required to carry on the activity in a profitable manner.  It seems unhelpful for petitioners to create and rely on a "revised" business plan based on earlier projections rather than actual expenses.  Such reliance on projections that have no semblance to reality or to historical income and expense information is foolish.  Although there is some indication that petitioners carried on the horse breeding activity as a separate business, we do not think that petitioners carried on their activity in a businesslike manner.

Petitioners' NSA records were unretrievable due to a change and upgrade of software.  As such, we are not able to review these purported records.

This factor favors respondent's position.

(2)  <u>The Expertise of The Taxpayer or Their Advisers</u>.

A taxpayer's expertise, research, and study of an activity, as well as his or her consultation with experts, may be

indicative of a profit objective.  Sec. 1.183-2(b)(2), Income Tax Regs.

The fact that Mrs. Reimer had experience in raising or maintaining horses prior to entering into the horse breeding activity does not alone show that the horse activity was engaged in with a profit objective.  See Glenn v. Commissioner, T.C. Memo 1995-399, affd. without published opinion 103 F.3d 129 (6th Cir. 1996).  At the time they started the activity, petitioners owned J-Mar Elbravado, which introduced them to the business of Arabian horse breeding.  Petitioners also sought general advice from other breeders, trainers, and an accountant.  However, there is no evidence that they reviewed the records of other breeding operations or sought specific advice as to how to make their operation profitable.  Similar to the taxpayers in Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355, 359 (7th Cir. 1987), petitioners could not point to any evidence that demonstrated how they planned to reduce their losses. ("The taxpayers' failure to consult economic experts or develop an economic expertise themselves is another fact that indicates a lack of profit motive".)  Nor could petitioners show how they monitored expenses or losses to enable them to make informed business decisions as to how to make their activity profitable.

This factor favors respondent's position.

(3)  The Time And Effort Expended by The Taxpayer in Carrying on The Activity.

The devotion of a great deal of personal time and effort by the taxpayer in carrying on an activity may indicate that it is engaged in for profit, particularly if there are no substantial personal or recreational elements associated with such activity. Sec. 1.183-2(b)(3), Income Tax Regs.

Mr. Reimer was employed full-time during 1994 and 1995. Mrs. Reimer was also employed full-time as a preschool teacher during the years in issue.  Mrs. Reimer worked on the horse breeding activity before and after school during the week and for 3 to 6 hours on Saturday and Sunday.  Mr. Reimer worked on the administrative aspects of the horse breeding activity about 10 to 15 hours each week.

Although the time and effort expended by petitioners on their horse breeding activity support a contention of profit objective, we discern that petitioners derived substantial recreational benefit from the time they spent with their horses and with the community of "horse people".

This factor is neutral.

(4)  Expectation That Assets Used in The Activity May Appreciate in Value.

An expectation that the appreciation in the value of the assets used in the activity will produce a profit when netted

against the losses from the operation of the activity may indicate a profit objective. Sec. 1.183-2(b)(4), Income Tax Regs.

Petitioners testified that they expected their horses to increase in value. They further testified that during the years in issue, their "herd" could have sold for $30,000 to $50,000. However, they did not provide any evidence besides their own belief of the value of their horses. Petitioners argue that the insurance coverage on Ms. Bak of $40,000 is "third party" evidence of the value of the horses. We note that the insurance coverage was for Ms. Bak in 1981, 12 years prior to the earliest year in issue, and petitioners failed to provide the actual policy showing the basis of this valuation. Even assuming their figure was the true market value of their herd, this would compensate them for only about one-quarter of $179,543, their total losses incurred from 1992 through 1998.

To be profitable, the horse breeding activity would need to produce future net earnings and appreciation in an amount greater than $179,543. Petitioners failed to produce any evidence to show that their activity had a reasonable chance of recovering their reported losses. See Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

This factor favors respondent's position.

(5)  The Success of The Taxpayer in Carrying on Other Similar or Dissimilar Activities.

The fact that a taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.

Mr. Reimer is a well-educated and smart businessman.  Upon entering the automobile sales industry, he advanced quickly from a salesperson to a financial manager.  He also used his skills to participate in the administration of various horse breeding shows, including writing scripts for the shows.  However, despite his ability to make contacts with others in the horse breeding industry, petitioners have consistently failed to make this activity profitable.  Mr. Reimer's efforts in the water and air filtration activity also failed to be profitable.

Even with Mr. Reimer's business experience and ability, we do not find that he applied such experience to their horse breeding activity to make it profitable.

This factor favors respondent's position.

(6)  The Taxpayer's History of Income or Losses With Respect to The Activity.

A history of income, losses, and occasional profits from an activity may indicate a profit objective.  Allen v. Commissioner,

72 T.C. 28, 34 (1979). Startup losses and losses that result from unforeseen circumstances do not necessarily show that a profit objective was lacking. Engdahl v. Commissioner, 72 T.C. 659, 669 (1979).

Petitioners argue that their horse breeding activity did not begin until 1976, just prior to the purchase of Emkay Asmara.[6] Mr. Reimer testified that he could not recall whether the horse breeding activity generated any net profit prior to 1992, and the record shows that they failed to make a profit from 1992 through 1998. It appears that any minimal income generated from 1992 through 1995 came from "other income" including fuel tax credits or refunds. From 1996 through 1998, petitioners generated sale of livestock income of $30,900, about one-third of the losses claimed in the time period, "custom hire" income of $41,605, and "other income" of $8,220. The magnitude of the losses in comparison with the revenues is an indication that petitioners did not have a profit objective. See Burger v. Commissioner, T.C. Memo. 1985-523.

At trial, Mr. Reimer testified that he would not have entered the NAS activity if he did not intend to make a profit. He further testified that he made many sales, "enough to keep us alive"; however, the returns from 1992 through 1994, the year

---

[6] For the purpose of this opinion, it is not necessary to decide whether the activity began in 1971 or 1976 because the years in issue are well beyond the seventh year in the activity. See sec. 183(d).

petitioners ended the activity, show that only losses were carried.

This factor favors respondent's position.

(7) The Amount of Occasional Profits, if Any, Which Are Earned.

An occasional small profit from an activity that generates otherwise consistently large losses may not be determinative that the activity is conducted for profit, although an occasional substantial profit may indicate a profit objective. Sec. 1.183-2(b)(7), Income Tax Regs. From 1976 through 1998, at least 22 years of operation, petitioners' horse breeding activity has never produced a profit. See McKeever v. Commissioner, T.C. Memo. 2000-288.

Petitioners failed to prove that they earned a profit from the NAS activity from 1990 through 1994, the year they terminated the activity. However, in reviewing petitioners' returns in the record, 1992 through 1994, we note that petitioners deducted gross receipts of $4,871, costs of good sold of $7,625, and expenses of $2,639, thus yielding a net loss of $5,393.

This factor favors respondent's position.

(8) The Financial Status of The Taxpayer.

The lack of substantial income from other sources may indicate a profit objective. Sec. 1.183-2(b)(8), Income Tax Regs. Conversely, substantial income from other activities may

indicate the lack of a profit objective, especially where the losses from the activity produce a tax benefit.  Id.

Petitioners reported Form W-2 income in the respective amounts of $70,621, $84,555, and $94,697 for 1993, 1994, and 1995.  Petitioners claimed net losses from the horse breeding and NAS activities of $23,657, $31,208, and $25,162 for 1993, 1994, and 1995, respectively.  Thus, petitioners reduced their taxable income by approximately 34 percent in 1993, 37 percent in 1994, and 27 percent in 1995, and accordingly their tax liability was reduced.

This factor favors respondent's position.

(9)  Elements of Personal Pleasure or Recreation.

The existence of personal pleasure or recreation relating to the activity may indicate the absence of a profit objection. Sec. 1.183-2(b)(9), Income Tax Regs.

While neither petitioner rides the horses purely for pleasure, petitioners acknowledge that they both derived personal pleasure in working with horses and horse breeding.  Mrs. Reimer trained the horses for show and derived much pleasure and pride in seeing her hard work result in IAHA sponsored awards.  She also enjoyed being in the "inner circle" of horse breeders and trainers with highly "political" connections.

The Court has recognized that "unquestionably, an enterprise is no less a 'business' because the entrepreneur gets

satisfaction from his work; however, where the possibility for profit is small (given all the other factors) and the possibility for gratification is substantial, it is clear that the latter possibility constitutes the primary motivation for the activity." Burger v. Commissioner, supra.

Because petitioners derived substantial personal pleasure from their horse breeding activity, including showing their horses, this factor favors respondent.

L.    Conclusion

Considering all the facts and circumstances, we find that petitioners' horse breeding activity was not engaged in for profit within the meaning of section 183(c).  In reaching our decision, we have considered the factors listed in section 1.183-2(b), Income Tax Regs., all arguments presented by the parties, and the unique facts of this case.

Petitioners engaged in their horse breeding activity for at least 22 years, with a net loss of at least $217,356 during 1992 through 1998.  Petitioners did not generate a profit or even come close to doing so during any of the years in issue.  We do not question petitioners' dedication to their horses.  But, based upon the totality of the circumstances and the objective facts, petitioners' arguments are unsupportable that their horse activity was engaged in for profit.  Petitioners did not prepare for the economic realities of the horse breeding business as

reflected in their inability to realize a profit in a meaningful time period.  Although they followed some business formalities, they failed to plan and project a reasonable method of turning their activity into a profitable enterprise.  The facts and evidence in this case lead us to conclude that during the years in issue petitioners were unreasonably willing to sustain massive losses in spite of their improbability of profits.

We further find that petitioners failed to prove that their NAS activity was engaged in for profit.  Petitioners offered very little evidence to support their contention that the NAS activity was maintained in a business like manner, that profits were ever sustained, or that they had a plan to make this venture profitable.

We hold that respondent's disallowance of petitioners' losses is sustained.

M.   Section 6651(a)(1) Addition to Tax

Respondent determined additions to tax as a result of petitioners' failure to timely file their respective tax returns for tax years 1994 and 1995.  Section 6651(a)(1) imposes an addition to tax for failure to timely file a tax return.  The addition to tax is equal to 5 percent of the amount of the tax required to be shown on the return if the failure to file is not for more than 1 month.  Sec. 6651(a)(1).  An additional 5 percent is imposed for each month or fraction thereof in which the

failure to file continues, to a maximum of 25 percent of the tax.
Id.

The additions are applicable unless petitioners establish
that their failure to timely file the returns was due to
reasonable cause and not willful neglect.  Id.  If petitioners
exercised ordinary business care and prudence and were
nonetheless unable to file their returns within the date
prescribed by law, then reasonable cause exists.  Sec. 301.6651-
1(c)(1), Proced. & Admin. Regs.  "Willful neglect" means a
"conscious, intentional failure or reckless indifference."
United States v. Boyle, 469 U.S. 241, 245 (1985).

Petitioners timely filed and were granted automatic
extensions to file their respective 1994 and 1995 Federal income
tax returns on August 15, 1995, and August 15, 1996,
respectively.  Petitioners' returns were filed with the Kansas
City, Missouri, field office on August 21, 1995, and August 23,
1996, respectively.

The postmark on the envelope attached to their 1995 return
shows a date of August 15, 1995.  We find that petitioners timely
filed their 1994 Federal income tax return.  Sec. 7502.
Accordingly, petitioners are not liable for the addition to tax
under section 6651(a) for 1994.

Petitioners' 1996 envelope in which their 1995 return was
mailed was not available in the record.  Mr. Reimer testified

that he mailed their 1996 return on August 15, 1996. The burden is on petitioners to prove that their return was filed on time or that the failure is due to reasonable cause and not willful neglect. Coltman v. Commissioner, 980 F.2d 1134 (7th Cir. 1992), affg. T.C. Memo. 1991-127. Petitioners' self-serving testimony that they mailed the return on August 15, 1996, without more, is insufficient to overcome this burden. Accordingly, petitioners are liable for the addition to tax under section 6651(a)(1) for the tax year 1996.

N.    Section 6662(a) Accuracy-Related Penalty

Section 6662(a) imposes an accuracy-related penalty of 20 percent of the portion of the underpayment which is attributable to negligence or disregard of rules or regulations. Sec. 6662(b)(1). Negligence is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c). No penalty shall be imposed if it is shown that there was reasonable cause for the underpayment and the taxpayer acted in good faith with respect to the underpayment. Sec. 6664(c).

Respondent argues that petitioners' treatment of the horse activity and NAS activity expenditures as business expenditures was negligent or an intentional disregard of rules or

regulations.  Petitioners sought the advice of one accountant sometime in the 1970s as they were entering the horse breeding activity.  Mr. Reimer also intentionally altered his Federal income tax withholding in full anticipation of the massive losses they were claiming in each respective year.  We hold that petitioners are liable for the accuracy-related penalty under section 6662(a) for each year in issue.

We have considered all arguments by the parties, and, to the extent not discussed above, conclude that they are irrelevant or without merit.

Reviewed and adopted as the report of the Small Tax Case Division.

Decision will be entered

under Rule 155.